**Mustafa Rafeeq Barazahi SADDIQ, Plaintiff,**

v.

**TRINITY SERVICES GROUP, et al., Defendants.**

**No. CV 13-01671-ROS-PHX (MHB)**

United States District Court, D. Arizona.

Signed 08/03/2016

Mustafa Rafeeq Barazahi Saddiq, Florence, AZ, pro se.

Lucy Marie Rand, Neil Singh, Office of the Attorney General, Phoenix, AZ, Gregory Dakent Cote, McCarter & English LLP, Boston, MA, Sharon S. Moyer, Sacks Tierney PA, Scottsdale, AZ, for Defendants.

## ORDER

Honorable Roslyn O. Silver, Senior United States District Judge

Plaintiff Mustafa Rafeeq Barazahi Saddiq, who is currently confined in the Arizona State Prison Complex (ASPC)-Florence, brought this civil rights case pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), *et seq.* (Doc. 18.) Pending before the Court are Defendants Arizona Department of Corrections (ADC) Director Charles Ryan's and Senior Chaplain James Vicklund's Motion for Summary Judgment, which Saddiq opposes (Docs. 55, 78), and Defendant Trinity Food Services Group's (Trinity's) Motion for Summary Judgment,[1] which Saddiq

---

1. Trinity filed a Motion to Seal, seeking to file its Motion for Summary Judgment and Statement of Facts under seal on the ground that these documents contained Saddiq's private medical information (Doc. 57). The Court

opposes (Docs. 72, 86.)[2]

The Court will grant both Motions.

## I. Background

On screening of the Third Amended Complaint (TAC) under 28 U.S.C. § 1915A(a), the Court determined that Saddiq stated RLUIPA claims against Trinity in Count One and Vicklund in Count Nine and a Fourteenth Amendment equal protection claim against Ryan in his official capacity in Count Five. The Court directed these Defendants to answer these claims and dismissed the remaining claims and Defendants. (Doc. 19.)

In Count One, Saddiq alleges that Trinity denied him healthy halal/kosher meals essential to the practice of his orthodox Muslim beliefs. (Doc. 18 at 5.) He alleges that according to the Quran, "the central, divine text of Islam," he is forbidden to eat non-halal foods or even to use utensils or other service items that are used for non-halal meals. (*Id.*) He alleges that Trinity refused to remedy its practice of serving "undercooked, raw, rotten, or unclean or non-halal foods." (*Id.*) Further, in order to save costs, it regularly serves meals on non-kosher trays instead of providing separate trays or disposable trays and utensils, even though it is recommended that Styrofoam or plastic-ware be used if separate kosher wares are not available. (*Id.*)

In Count Five, Saddiq alleges that ADC has a policy and practice of providing enhanced meals for Christian and Jewish prisoners on their religious holidays, as contracted with Trinity and authorized in ADOC's food service manual, but it denied repeated requests from Saddiq and other Muslim inmates to receive special holiday meals for Eid al-Adha and Eid ul-Fitr observances. (*Id.* at 10.) He further alleges that while Christian and Jewish prisoners receive enhanced meals for their religious holidays at 30% above the normal cost, Muslim prisoners have been denied hot meals for Ramadan since September 2012 and instead are provided only one "mega sack" per day, except on weekends, for 30 days. (*Id.*)

In Count Nine, Saddiq alleges that he has been confined at ASPC-Eyman since September 3, 2010 and that senior chaplain Vicklund "did hinder [Saddiq] from observing sacred Islamic tenets on numerous occasions." (*Id.* at 16.) Specifically, Vicklund "denied Plaintiff a congregation prayer service for October 3, 2014 Eid al-Adha" without any prior memo or verbal instruction of a policy requiring a 30-day notice for such request, even though the service had otherwise been held annually before this denial. (*Id.*) Vicklund also failed to provide "a place for Muslim prisoners to congregate" for religious observances from September 2012 to October 2014, even though he "routinely provides" special places, meals, matzo bread for Jewish prisoners, religious books, and other items at no cost "to practicing members of larger, more popular religious groups." (*Id.* at 17.) Saddiq also alleges that Muslim prisoners must go through a lengthy process and pay high costs to order edible dates for Ramadan, but the prison provides such things as musical instruments for Christians and wood for Native Americans at no charge. (*Id.*)

---

granted the Motion to Seal and further required that Saddiq's responsive pleadings be filed under seal. (Doc. 61.) Where the parties have lodged proposed documents to be filed under seal and these documents have subsequently been filed under seal, the Court will refer to the docket numbers of the sealed documents. Trinity's Statement of Facts was filed under seal as Doc. 66, and its Motion for Summary Judgment was filed under seal as Doc. 72.

**2.** The Court provided notices to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir.1998) (en banc), regarding the requirements of a response. (Docs. 70, 73.)

## II. Legal Standards

### A. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir.2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255, 106 S.Ct. 2505. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### B. Equal Protection

■ The Equal Protection Clause requires that persons who are similarly situated be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir.2008). An equal protection claim may be established by showing that prison officials intentionally discriminated against a plaintiff based on his membership in a protected class, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir.2009); *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir.2001), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601–02, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008); *Will. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir.2008).

■ In addition, an inmate " 'must set forth specific facts showing that there is a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths" and that "officials intentionally acted in a discriminatory manner." *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir.1997),

*abrogated on other grounds by Shakur,* 514 F.3d at 884–85.

### C. RLUIPA

Under RLUIPA, a government may not impose a substantial burden on the religious exercise of a confined person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). This "compelling government interest" and "least restrictive means" test replaced *Turner v. Safley*'s, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), "legitimate penological interest" test. *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-l(a)). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Id.* at 995 (citing 42 U.S.C. § 2000cc-3(g)).

■ The inmate bears the burden of establishing prima facie that RLUIPA has been violated and that his religious exercise has been substantially burdened. *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)). The government then bears the burden of proving that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Id.* at 995 (citing 42 U.S.C. §§ 2000cc-l(a), 2000cc-2(b)).

### III. Defendants Ryan's and Vicklund's (State Defendants') Motion

#### A. Relevant Facts [3]

Saddiq is an Orthodox Muslim immigrant from Sudan who has been in ADC custody since August 1991. (Doc. 79 at 26 (Saddiq Aff.) ¶ 1.) He is currently housed in ASPC-Eyman, Cook Unit. (*Id.*)

According to Saddiq's Orthodox Islamic religious beliefs, Eid al-Fitr and Eid al-Adha are sacred observances for which congregational prayers and feasts are commanded by Islamic Law and the Prophet Muhamad. (*Id.* at 28 ¶ 8.) Fasting during Ramadan is also obligatory upon all able-bodied adult Muslims, and breaking the fast with edible dates is a sacred tradition. (*Id.* ¶¶ 9-10.)

#### 1. Special Religious Observances

On September 24, 2014, while incarcerated at ASPC-Eyman, Saddiq submitted an Inmate Letter to Cook Unit Chaplain Freemont requesting that Freemont "set aside a place for Muslims to pray the Eid al-Adha service coinciding with Dhul-Hijjah 9 on October 3, 2014." (Doc. 56 ¶ 5; Doc. 56-4 at 2.) Saddiq specified, "We require a morning time 8:30 to 10 AM if possible." (Doc. 56-4 at 2.) Freemont denied this request on September 25, 2014 on the ground that "[a]ll special religious observance requests must be submitted in writing 30 days in advance." (*Id.*)

Saddiq submitted an Informal Complaint regarding this denial on October 1, 2014,[4] and Correctional Officer (CO) III Okafor investigated the matter and responded in writing, stating "Chaplain Freemont explained that you are to submit such a request 30 days prior, and this is regardless of your religion. It has nothing to do with discrimination against Muslims." (Doc. 56-5 at 2.)

Saddiq appealed this response in a grievance dated October 23, 2014,[5] and a

---

3. These facts are taken from State Defendants' Statement of Facts (Doc. 56), Saddiq's Statement of Facts (PSOF) (Doc. 79), and the parties' supporting exhibits.

4. Neither party attaches a copy of this grievance; the facts set forth here are taken from the response Plaintiff's Informal Complaint.

5. As above, neither party attaches a copy of this grievance; the facts set forth here are

Deputy Warden responded in writing, stating he had consulted with Chaplain Vicklund and had reviewed Department Order (DO) 904, and, "[a]ccording to the chaplain, the 30-day requirement is so that accommodations can be made for the request, such as location, availability of religious staff and/or security" and that Muslim inmates must make requests to participate in Ramadan 30 days in advance and Jewish inmates must make requests to participate in Passover 90 days in advance. (Doc. 56-6 at 2.) He also quoted DO 904 1.4.4, "Special Annual Religious Events," which reads as follows:

> 1.4.4.1 Special Annual Religious Events are closed religious events limited to inmates with religious preference designations for the religion in question, volunteers[,] and guest performers not on participating inmates' visitation list.
> 1.4.4.2 These events shall be planned by Chaplains in consultation and with the assistance of outside sponsors and inmate representatives.
> 1.4.4.3 Wardens or Deputy Wardens shall approve the final selection list of inmate attendees from close and maximum custody units.

(Id.; Doc. 56-7 at 13.) The Deputy Warden also informed Saddiq that, according to Vicklund, each inmate wanting to attend a special religious event must individually submit a request on an inmate letter, and the practice is already in place for inmates to submit these requests and be placed on the turnout for special religious activities. (Id.) The Deputy Warden concluded, "[t]he Chaplain's decision to request a minimum of 30 days is not violating any policies; therefore, I consider this issue resolved." (Id.)

Saddiq appealed this response to the Complex Warden on November 26, 2014 (Doc. 79 at 22), and his appeal was denied on December 1, 2014 on the ground that

DO 904.1.4.4.2 requires that special religious events must " 'be planned by the Chaplain in consultation and with the assistance of outside sponsors and inmate representatives,' " and based on this policy, the Chaplain needs a 30-day advance request for any religious services. (Doc. 79 at 24.) The Warden noted that Saddiq's "request for food, guest speakers[,] and family visits may be requested through the Chaplain's office for approval or denial" and concluded that the issue was resolved. (Id.)

Saddiq appealed this decision to Director Ryan on December 18, 2014, objecting that the 30-day advance notice requirement had never been required prior to 2014 and requesting that all subsequent Eid al-Adha and Eid al-Fitr prayers be honored with approved guests, religious songs, and special meals and sweets provided by ADC "as they pay for Christian holiday meals, Passover, and choir instruments. Otherwise Muslims suffer discrimination." (Doc. 89 at 18.)

The Inmate Grievance Appeal Response issued on behalf of Director Ryan on January 12, 2015 concluded that Saddiq had not shown that he was unable to observe Eid al-Adha, he failed to establish that a 30-day notice requirement for special accommodations is against policy or substantially burdens his religious practice, and he failed to show that he requires a place separate from his own living area or already-available common areas to observe Eid al-Adha. (Doc. 79 at 20.) It also stated that "a group prayer service for Eid al-Adha may be arranged providing more than one inmate submits a request within thirty days" and that "the arrangements must be consistent with what is allowed in the prison unit in question." (Id.)

taken from the response Plaintiff's Formal Grievance.

On July 14, 2015, Chaplain Henry approved a list of Muslim inmates to attend an hour-long celebration for Eid al-Fitr on Saturday, July 18, 2015, during which they would have the opportunity to "share special prayers" and receive their morning meal "to celebrate the successful completion of a month of fasting." (Doc. 79-1 at 41.) The meal ADC provided for this event was the general population meal and did not include special holiday portions. (Doc. 79 at 9 ¶ 26.)

### 2. Enhanced Meals

ADC's "Food Service" policy is set forth in Department Order (DO) 912. (Doc. 56, State Defs. Statement of Facts, ¶ 2; Doc. 56-2.) Subsections 912.03.1.1 and 912.03.1.1.1 of this policy state that "[i]n accordance with the Food Service Technical Manual[,]" ADC's Food Service Contractor "shall provide six enhanced meals annually." (Doc. 56-2 at 5.)[6] The Food Service Technical Manual (FSTM), also known as 912-T-OPS, further specifies in subsection 912.06(1.2), titled "Special Holiday Meals," that "[t]he Contractor shall provide six (6) special Holiday meals annually that shall be provided at a cost of 30% more than the average raw food cost." (Doc. 56-3 at 9.) Appendix A of the FSTM includes "Special Holiday Menus" for the following six occasions: Christmas, Cinco de Mayo, Juneteenth, the 4th of July, the Super Bowl, and Thanksgiving. (Doc. 56-3 at 24-25.) Appendix A does not include Islamic festivals such as Ramadan, Eid al-Adha, and Eid al-Fitr. (Doc. 79, PL Statement of Facts, ¶ 3.)

In addition to the above-cited requests, Saddiq submitted an Inmate Letter to Vicklund on August 18, 2015, notifying him that the Islamic holiday Eid al-Adha would be held on September 22, 2015, and requesting a time between 8:30 and 10:00 a.m. for a special service, including prayer, a sermon, Islamic songs; and "the required feast." (Doc. 56 ¶ 1; Doc. 56-1 at 2.) Saddiq asked specifically for "a special holiday meal per DO 912 and 912-T-OPS Food Service Technical Manual 912.06(1.2) at 30% more than the average raw food cost." (Doc. 56-1 at 2.) He specified that he wanted "halal/kosher" meals or "Passover type special entrees" of "beef stroganoff, jambalaya, or buffalo wings" and "kosher/halal pastry or ice cream, dates or fresh whole fruits" as well as grape juice or apple juice with each meal. (Id.) Saddiq explained that Eid al-Adha was "a sacred festival commemorating Abraham's sacrifice." (Id.)[7]

### 3. Ramadan Fasting

On August 15, 2013, Saddiq filed an Inmate Grievance in which he claimed that "AD[ ]C's new policy announced by memorandum to Trinity Services Group for Ramadan 2013[ ] severely inhibits the proper fasting criteria prescribed by Quranic law and [Islamic teachings]." (Doc. 79-1 at 8.)[8] In particular, he complained that Ramadan meals should be "served hot" and in "properly sized portions," such as those served for Jewish Passover and Christmas," instead of in a single "mega sack" of cold food. (Id.) Saddiq appealed the denial of this grievance up to the Warden, and that appeal was denied on October 4, 2013. (See Docs. 79 at 39, 41, 42.) The Warden stated that, upon investigation, he determined "the meal service for Ramadan was reviewed and approved by a contract Dieti-

---

**6.** The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

**7.** Neither party provides any evidence concerning Vicklund's response to this request.

**8.** Saddiq does not provide a copy of this purported Memorandum or point to any evidence other than his own assertions in his grievances to show ADC's Ramadan meal policies. These assertions are only evidence of what Saddiq claimed, not of the actual policies in place.

tian and in consultation with Religious Services," and it provided adequate nutrition. (*Id.*) He also stated that ADC changed to providing a single shelf-stable sack meal as an accommodation to allow Muslim inmates to consume their meals in their housing units at times suitable to their religious guidelines because Muslim inmates had complained that the breakfast was not being served early enough to allow them to participate in Ramadan. (*Id.*)

### 4. Edible Dates

ADC permits inmates of various religions to use special foods and other items for purposes of engaging in religious activity. (Doc. 56-8, Vicklund Decl., ¶ 5.) Some units within ADC's prison system have musical instruments and sound systems that they make available to adherents of all faiths if they desire to use them. (*Id.* ¶ 7.) Inmates of all faiths are also permitted access to donated items from their respective religious communities. (*Id.* ¶ 9.) Jewish organizations provide matzo to Jewish prisoners, and Native American organizations provide wood for the use of Native American prisoners in their religious ceremonies, but ADC does not provide these items to inmates or make them available for free. (*Id.* ¶¶ 8-9.) Muslim inmates have the same access to donated items from Islamic religious organizations that inmates of other faiths have to donated items from their respective religious communities, and ADC would allow them to receive dates for free if such an organization offered them.[9] In recent years, Muslim inmates have been able to obtain dates from the Tucson Islamic Center which

makes them available for purchase. (*Id.* ¶ 9.)

Saddiq filed an Inmate Letter on April 3, 2015, requesting to participate in Ramadan fasting, beginning on June 18, 2015, and to receive order forms for edible dates. (Doc. 79-2 at 29.) Responses to this letter indicate that Saddiq was "added to the Ramadan turnout" and told that information about ordering dates would be provided to him. (*Id.Id.* at 25.) A 2013 order form from the Islamic Center of Tuscon shows that it offered to provide dates "exclusively for our inmate brothers and sisters" at a cost of $6.00 per 60 dates. (Doc. 79-3 at 2.) Saddiq ordered three quantities of 60 dates from this organization, for a total of $18.00, on June 21, 2014. (*Id.* at 6.) ADC received one shipment by U.S. mail of three "packages of dates" for him, presumably from an earlier order, on June 19, 2014 and another shipment of three "bags of dates" on July 3, 2014, both of which Property made available for him to pick up on July 7, 2014. (*Id.* at 4, 13.) Saddiq also ordered one quantity of 60 dates from the same organization, for a total of $6.00, on June 10, 2015, and ADC received one quantity of 60 dates for him on June 19, 2015, which Property made available to him for pickup that same day. (*Id.* at 10.)

### B. Discussion

#### 1. Ryan

■ State Defendants move for summary judgment on Saddiq's equal protection claim against Ryan in his official capacity in Count Five. (Doc. 55 at 2-6.) When a state official is sued in his official

---

9. Saddiq disputes that ADC would allow Muslim inmates to receive donated dates if a Muslim organization offered them; instead, he claims, ADC only allows Muslim prisoners to buy dates from approved vendors. (Doc. 79 ¶ 9.) In support, he refers to a purported inmate letter response from Chaplain Miser, dated June 14, 2011. (*Id.*) The Court was

unable to locate this response based on Saddiq's citation to "Exhibit K." Exhibit K is a September 12, 2013 Inmate Grievance Appeal regarding the denial of Saddiq's request that Muslim inmates receive hot meals instead of "mega sacks" during Ramadan and does not show that Muslim inmates would be unable to receive donated dates. (*See* Doc. 79 at 41.)

capacity, the real party in interest is not the individual, but the state. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). For a state official to be liable in his official capacity, a plaintiff must show injuries resulting from a policy, practice, or custom of the governmental entity for which that individual exercises final policy-making authority. *See Cortez v. County of Los Angeles*, 294 F.3d 1186, 1188 (9th Cir.2002); *see also Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983").

■ To the extent Saddiq's equal protection claim rests on allegations that ADC officials denied his requests to hold special Islamic religious gatherings while allegedly providing special meals to adherents of other religions, these denials do not support that ADC's enhanced meal policy is discriminatory. Nothing in the record links the denials of Saddiq's requests for gatherings with that particular policy. The evidence shows, instead, that Saddiq's inmate letters and appeals requesting a special prayer service and feast were denied on the basis of an asserted 30-day notice requirement. (Doc. 56-5 at 2, Doc. 56-6 at 2, Doc. 79 at 20, 24.) To the extent Saddiq appears to argue in his response that this requirement was arbitrary and used only to discriminate against him on the basis of his religion (*see* Doc. 78 at 11), the evidence does not support that the enhanced meal policy—which provides meals across-the-board to all inmates for six pre-determined special occasions—has any relevance to his request for an enhanced meal at a Muslim-specific religious event. Saddiq has not, for instance, provided evidence to show that similarly situated members of other religions received enhanced meals for their private religious events based on this policy, while his request was denied; nor does he point to anything in the enhanced meal policy, itself, showing it applies to the type of event he requested. Moreover, the undisputed facts show otherwise. In response to Saddiq's appeal, the Deputy Warden cited to D.O. 904 1.4.4 as the applicable policy governing "special annual religious events." (Doc. 56-6 at 2.) According to D.O. 904 1.4.4, such events are "closed religious events limited to inmates with religious preference designations." (Doc. 56-7 at 13.) Based on this evidence, Saddiq's special event request was governed by a separate policy providing annual religious celebrations for inmates who adhere to a specific religion and not by the enhanced meal policy Saddiq invokes. On this record, there is no evidence to support that Saddiq received unequal treatment with respect to his requests for Islamic religious observances, including a special feast, due to ADC's allegedly discriminatory enhanced meal policy. Nor are there any facts to suggest that Saddiq received unequal treatment to inmates of other religions due to D.O. 904 1.4.4 or due to ADC's asserted 30-day notice requirement.

■ The record also does not support a policy-based equal protection claim against Ryan based on the "mega sack" meals ADC provides for Muslim inmates during Ramadan. Saddiq provides only his own grievances as evidence that he complained that Ramadan meals were not equivalent to the meals ADC allegedly provides for Passover and Christmas. But Saddiq's assertions in his grievances are not evidence, and, aside from the policies already discussed, the record is devoid of evidence regarding the allegedly unequal policy provisions ADC follows for Ramadan versus other requested religious observances. Ab-

sent such evidence, Saddiq's assertions that ADC's policies discriminate against Muslims over members of other religions with regard to requests for special religious events or Ramadan meals are unfounded.

■ Saddiq also appears to assert an equal protection claim on the ground that ADC's enhanced meal policy is discriminatory, even apart from the above allegations, because it inherently favors Christianity over other religions, including Islam. (Doc. 78 at 4.) State Defendants argue that this policy, which provides for "six enhanced meals annually" is facially neutral and is not motivated by a religious agenda or one that discriminates against Muslims. (Doc. 55 at 4-5; Doc. 56-2 at 5.) They request the Court take judicial notice that Cinco de Mayo commemorates a Mexican battle victory on May 5, 1862, Juneteenth commemorates the end of slavery in the United States, the Fourth of July commemorates the Declaration of Independence, and the Super Bowl is a football event. (Doc. 55 at 3-4.) They concede that Christmas is a religious holiday, and Thanksgiving can be construed as such, but they argue that Christmas is also a holiday of national importance, and Thanksgiving is not limited to a particular religious faith. (*Id.* at 4-5.)

The Court takes judicial notice that four of the six occasions ADC designates for special holiday meals (Cinco de Mayo, Juneteenth, the 4th of July, and the Super Bowl) are traditionally celebrated for historic and cultural reasons and have no direct religious significance. *See* Fed. R. Evid. 201(b) ("The Court may judicially notice a fact that is not subject to reasonable dispute because it ... is generally known within the trial court's territorial jurisdiction."). Saddiq does not explain how offering any of these six special meals furthers a particular religious agenda, but

he points out in his response that ADC's policy "omits any Islamic holiday meals while accommodating Christmas." (Doc. 78 at 4; Doc 79 at 2 ¶ 2.) He also asserts in his Statement of Facts that ADC's enhanced meal policy "only accommodates a single faith's religious meal observance: Christianity." (Doc. 79 at 2 ¶ 4.) He goes on to say that "[i]t even omits Orthodox Jewish meals for Passover and Seder." (*Id.*) Thus, his claim that ADC's enhanced meal policy violates equal protection ultimately appears to rest on ADC's inclusion of Christmas on the list of special occasions for which it offers enhanced meals to all inmates, coupled with its failure to include Islamic or any other religious holidays.

*Lynch v. Donnelly*, which State Defendants cite, is relevant to the underlying issue presented in this claim, namely whether public recognition of a holiday that has both religious and clear cultural significance constitutes an endorsement of a particular religion. 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). *Lynch* dealt specifically with whether it was a violation of the First Amendment Establishment Clause for the City of Pawtucket, Rhode Island to include a creche in its annual Christmas display, which included other traditional Christmas decorations, including figures of Santa Clause with a sleigh, reindeer, a Christmas tree, strings of lights, and a banner reading "Seasons Greetings." *Id.* at 671–72, 104 S.Ct. 1355. As relevant here, the Supreme Court did not find that providing a publicly-funded Christmas display was, itself, an improper endorsement of religion. Rather, it recognized Christmas, along with Thanksgiving, as "National Holidays" that have long been officially acknowledged in the United States, including through Executive Orders, announcements by Congress, and paid leave for federal employees. *Id.* at 676, 104 S.Ct. 1355. As to the more directly religious connotation of the crèche, the

Court again emphasized the legitimate secular purposes of the Christmas display and found that the City's inclusion of the crèche with other non-religious imagery contributed to those purposes, namely "to celebrate the Holiday and depict the origins of that Holiday," and therefore did not run afoul of the Establishment Clause. *Id.* at 681, 104 S.Ct. 1355.

Although not an equal protection case, *Lynch*'s, observation that Christmas is a "National Holiday," for which it found public recognitions serve legitimate secular purposes, is relevant to Saddiq's equal protection claim, which requires a showing that ADC intentionally treats Christian inmates more favorably than those of other faiths absent "some rational relationship to legitimate state purposes." *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *see Engquist,* 553 U.S. at 601–02, 128 S.Ct. 2146; *Freeman,* 125 F.3d at 737. ADC's provision of special meals for all inmates, regardless of religion, for six nationally-recognized special occasions shows that its policy is rationally related to a legitimate state purpose. Its inclusion of Christmas, which has both religious and national significance, with five other special occasions, at least four of which—including Cinco de Mayo and the Super Bowl—are purely secular, is analogous to the City of Pawtucket's inclusion of a single religious symbol as part of its mostly secular Christmas display that the Supreme Court in *Lynch* found did not show the City endorsed a particular religious agenda. The facts in this action likewise fail to show that ADC's special meal policy serves a religious agenda that intentionally leaves out Islamic holidays and thereby discriminates against Muslim inmates. Further, it is undisputed that ADC has a separate policy (DO 904.1.4.4) through which members of any religious group may request private celebrations for their particular annual religious observances. (Doc. 56-7 at 13.) Thus,

the record does not support that ADC's policies fail to afford Saddiq "a reasonable opportunity to pursue his faith as compared to prisoners of other faiths" and that "officials intentionally acted in a discriminatory manner." *Freeman v. Arpaio,* 125 F.3d 732, 737 (9th Cir.1997), *abrogated on other grounds by Shakur,* 514 F.3d at 884–85.

For the foregoing reasons, the Court will grant summary judgment to State Defendants on Saddiq's equal protection claim against Ryan in his official capacity in Count Five.

### 2. Vicklund

Saddiq's RLUIPA claim against Vicklund is based on Vicklund's alleged denials of his requests to hold Islamic study groups and congregational prayer services for Islamic religious celebrations and his failure to provide edible dates for Muslim inmates during Ramadan. (Doc. 18 at 16-17.) State Defendants argue that Vicklund is entitled to summary judgment on this claim because Saddiq fails to show that Vicklund imposed a "substantial burden" on his religious exercise, as is required to make a prima facie case under RLUIPA. (Doc. 55 at 8-12.) *See Warsoldier,* 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)).

#### a. Congregational Prayer Services

Saddiq alleges specifically that Vicklund denied his request for a congregational prayer service in celebration of Eid al-Adha on October 3, 2014. (*See* Doc. 18 at 16.) As noted in the fact section above, Chaplain Freemont initially denied this request on the ground that Saddiq failed to submit it 30 days in advance of the proposed event. (Doc. 56-4 at 2.) Saddiq argues that the asserted 30-day notice requirement had never been raised before, and he claims that Vicklund instituted it without notice in retaliation against Saddiq for filing this civil rights action on August

15, 2013. (Doc. 78 at 11.) Saddiq has not alleged retaliation in the TAC, however, and no such claim is before the Court. For purposes of RLUIPA, Saddiq must show that being required to give 30 days' notice for special religious gatherings imposes "a substantial burden" on the exercise of his beliefs. A substantial burden is one that is " 'oppressive' to a 'significantly great' extent." *Warsoldier*, 418 F.3d at 995 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir.2004)) "That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Id.* A substantial burden must be "more than an inconvenience"; it prevents an inmate from "engaging in [religious] conduct or having a religious experience." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir.2000) (citations omitted).

State Defendants argue that the 30-day notice requirement is a minor inconvenience, not a "substantial burden" on Saddiq's religious exercise that would "pressure [him] to abandon a religious belief." (Doc. 55 at 10.) They note that if Saddiq had wanted to hold congregational prayers for Eid al-Adah on October 3, 2014, he only needed to make his request by September 3, 2014, instead of waiting until nine days before the proposed event. (*Id.*) The Court agrees that a 30-day notice requirement for holding congregational services in the prison context is not, itself, a substantial burden, or one that is "oppressive to a significantly great extent." Saddiq argues, however, that a lack of prior notice kept him from complying with this unwritten requirement and thus led to the denial of his request for congregational prayers for Eid al-Adha—the celebration of which he asserts is fundamental to his Islamic religious practice. (Doc. 78 at 10, Doc. 79 at 28 ¶ 8.)

Viewing the evidence in a light most favorable to Saddiq, these assertions raise a genuine issue of material fact that Vicklund's unforeseen implementation of the 30-day notice requirement placed a substantial burden on Saddiq's religious exercise, at least with respect to his ability to hold congregational prayers for Eid al-Adha on this one occasion. Resolving this narrow issue in favor of Saddiq does not end the Court's inquiry as to whether this incident constitutes a violation under RLUIPA, however. Even assuming the denial of Saddiq's September 3, 2014 request to hold an Eid al-Adha service due to lack of adequate notice placed a substantial burden on his religious practice at that time, the Court must still determine whether the denial served a "compelling governmental interest" and did so by "the least restrictive means." 42 U.S.C. § 2000cc–1(a)(1)-(2).

The evidence shows that the Deputy Warden who responded to Saddiq's grievance on this issue consulted with Vicklund, who explained that the 30-day notice requirement was "so that accommodations can be made for the request, such as location, availability of religious staff and/or security." (Doc. 56-6 at 2.) The Complex Warden also noted in response to Saddiq's appeal that DO 904.1.4.4.2 requires special religious events to be " 'planned by the Chaplain in consultation and with the assistance of outside sponsors and inmate representatives,' " and based on this policy, the Chaplain needs a 30-day advance request for any religious services. (Doc. 79 at 24.) This evidence shows that ADC had a compelling interest for requiring 30 days' notice before allowing inmates to hold private religious events.

The record also does not support that the above requirement, even if it caught Saddiq by surprise, was more restrictive than necessary. Saddiq does not

claim, for example, that he was left unable to observe Eid al-Adha in his own living area or already-available common areas, as suggested by Ryan. (*See* Doc. 79 at 20.) Nor does Saddiq put forth any evidence that the 30-day notice requirement was too onerous to allow him or other Muslim inmates to make requests to hold prayer gatherings for subsequent Islamic holidays. In fact, the evidence shows that Chaplain Henry approved just such a request for a special event celebrating Eid al-Fitr on July 18, 2015, and Saddiq puts forth no evidence that the 30-day notice requirement was so restrictive that it prevented him or other Muslim inmates from requesting or participating in this event. On these facts, Saddiq fails to state a RLUIPA claim based on Vicklund's denial of congregational prayer services. His more general allegations that Vicklund inhibited Muslim religious services and study groups from 2012 to 2014 are unsupported and do not compel a different conclusion.[10] The Court will grant summary judgment to State Defendants on Saddiq's RLUIPA claim against Vicklund insofar as that claim is based on the denial of Saddiq's requests to hold Islamic congregational prayer services or other religious events.

### b. Edible Dates

State Defendants also argue, and the Court agrees, that the record does not support that Vicklund's failure to make edible dates available to Saddiq at no cost during Ramadan places a substantial burden on his religious practice. (Doc. 55 at 10-11.) First, Saddiq attests only that breaking Ramadan fasts with edible dates is "a cherished Sunnah (sacred tradition)" (Doc. 79 at 28 ¶ 9); he does not explain how dates are important to him personally or how not having them to break his fasts imposes—or would impose—a significant restriction on his religious experience. Second, the undisputed evidence shows that Saddiq is able to purchase dates for Ramadan and has done so in the past at costs of $6.00-$ 18.00 a year. (Doc. 79-3 at 2, 4, 10, 13.)

Saddiq complains that ADC's approved vendors for dates do not make them available for free, the orders seldom arrive in time for the start of Ramadan, and ADC property officers do not make them immediately available when they do arrive. (Doc. 78 at 14.) In support of his timeliness complaint, Saddiq points to his Inmate Property forms showing that for Ramadan 2014, which began on June 28, ADC received the dates he ordered on June 19 and July 3, but only made them available to him for pick up on July 7, ten days into Ramadan. (*Id.* at 14, Doc. 79 at 12 ¶ 44, Doc. 79-3 at 4, 13). Additionally, for Ramadan 2015, which began on June 18, ADC received Saddiq's dates on June 19 and made them available to him the same day, one day into Ramadan. (Doc. 78 at 14, Doc.

---

10. In his response and Statement of Facts, Saddiq claims that Vicklund has a long history of engaging in discriminatory and retaliatory policies toward Muslim inmates, and he attaches numerous grievances and responses from ADC staff members in apparent support. (*See* Doc. 78 at 11, Doc. 79 at 6 ¶¶ 15-17, 7-8 ¶¶ 20-23.) The Court's review of these attachments, however, shows only that Saddiq filed ongoing grievances and grievance appeals regarding the turnout times for breakfast during Ramadan and ADC's switch to offering a single mega-sack meal for inmates choosing to observe Ramadan fasts. (Doc. 79-1 at 37-42, Doc. 79-1 at 15-34.) His attachments and general citations to these grievances as a whole are not useful; nor does it appear that any of the grievances relates to Vicklund's alleged denials of his requests to hold congregational prayers and study groups as alleged in Count 9 on the TAC. In sum, apart from the 30-day imposition already discussed, Saddiq fails to identify specific actions Vicklund took in violation of his rights under RLUIPA or to cite to particular portions of the record to support such claims. *See* LR Civ. 56.1(b).

79 at 12-13 ¶ 47, Doc. 79-3 at 10.) This evidence is also insufficient to show or create a genuine issue of material fact that Vicklund substantially burdened Saddiq's religious exercise. Absent additional facts, it is not clear that Vicklund was responsible for or could have prevented these delivery delays. Moreover, Saddiq has not shown that the costs and delays he experienced in ordering dates, while inconvenient, placed "a significantly great restriction or onus" upon his religious exercise or kept him from having or engaging in a religious experience. *Warsoldier*, 418 F.3d at 995; *Worldwide Church of God*, 227 F.3d at 1121. Saddiq's RLUIPA claim against Vicklund on this issue fails.

To the extent Saddiq also appears to assert an equal protection claim based on his allegations that members of other religions receive their requested religious items for free while he must pay for edible dates (Doc. 78 at 13-14), this claim also fails. State Defendants provide evidence that, other than musical instruments and equipment it makes available to all religious groups equally, ADC does not provide special items for any religious group to use in its observances for free, but instead allows all religious groups to receive approved items donated by their religious communities for such purposes. (Doc. 56-8 ¶¶ 5-9.) Saddiq does not point to any facts in the record to show otherwise. Saddiq's assertions that ADC includes some religious food items, such as matzo, in its kosher religious diet, or makes such foods available for purchase in the commissary, but does not do so for edible dates (Doc. 78 at 13) is also not a sufficient basis for an equal protection claim. *See Freeman*, 125 F.3d at 737 (prisons need not provide identical accommodations to different faiths, but must make good faith accommodations of the prisoners' rights in light of practical considerations).

For the foregoing reasons, the Court will grant summary judgment to State Defendants on Saddiq's RLUIPA and apparent equal protection claims against Vicklund in Count Nine.

## IV. Trinity's Motion

### A. Relevant Facts [11] [12]

#### 1. Saddiq's Religious Beliefs

Saddiq is an Orthodox Muslim from Sudan who is serving a life sentence in ADC custody. (Doc. 87, Saddiq's Statement of Facts, ¶ 53.) Throughout his confinement, Saddiq has sought Orthodox Islamic (halal) foods from any source available to him as a prisoner. (*Id.* ¶ 78.) On October 12, 2008, as part of a settlement agreement in a prior case, ADC agreed to provide Saddiq with a kosher diet as an accommodation to his religious beliefs. (Doc. 87-1 at 42 (Stipulation for Dismissal with Prejudice in *Saddiq v. Schriro*, CV 07-510-PHX-ROS (MHB).) It further agreed that, if ADC

---

11. These facts are taken from Trinity's Statement of Facts (Doc. 66), Saddiq's Statement of Facts (Doc. 79), and the parties' supporting exhibits.

12. Trinity includes several pages of facts in its Statement of Facts that merely provide background to the action or are otherwise entirely irrelevant to the claims before the Court. (*See* Doc. 66 ¶¶ 1-16, 21.) Plaintiff's Statement of Facts likewise includes lengthy responses to these largely irrelevant facts, including facts about the alleged suspension of his kosher diet or the scheduling of meals, which are not part of his claim against Trinity. For these reasons, the Court's task of ascertaining the relevant facts in this action was made unnecessarily difficult and time-consuming. The Court reminds Trinity of its obligation to comply with Local Rule 56.1 (a). "The separate statement [of facts] should include only those facts that the Court needs to decide the motion. Other undisputed facts (such as those providing background about the action or parties) may be included in the memorandum of law, but should not be included in the separate statement of facts." LR Civ. 56.1(a).

later instituted a halal diet, it would provide him with that diet in place of the kosher diet. (*Id.*)

According to Saddiq, the Orthodox Islamic dietary laws he follows are similar, but not identical to, Orthodox Jewish dietary laws. (Doc. 87 ¶¶ 57, 58.) As with the kosher diet, religiously-permitted foods must not be prepared or served using cookware, table tops, utensils, and serving items used to prepare and serve prohibited foods. (*Id.* ¶¶ 59-60.) Despite similarities, kosher-certified foods are not the same as halal-certified foods because kosher meals may contain some ingredients such as gelatin and yeast that are not halal. (*Id.* ¶¶ 68-71, 75; Doc. 37-6 at 2; Doc. 87-2 at 9 § A.6.) ADC has not, as yet, provided a religious diet that fully accommodates Saddiq's Orthodox Islamic beliefs. (Doc. 87 ¶ 81.)

Saddiq has been authorized to receive a kosher diet each year from at least 2011 to the present. (Doc. 67-2 at 2-6.)[13] Saddiq has filed a number of grievances regarding Trinity's provision and service of kosher meals within ADC, including that Trinity uses spoiled hot entrees, inedible frozen foods, and rotten vegetables, and it serves kosher meals on non-kosher trays. (*Id.* ¶¶ 90-92, 95.)

### 2. Trinity's Meal Service Responsibilities

Trinity provides inmate meals and food services to ADC in accordance with the policies and procedures set forth in DO 912; ADC's Food Service Technical Manual, 912-T-OPS; and ADC's Diet Reference Manual. (Doc. 66, Def. Statement of Facts, ¶ 19, Doc. 67, Dolan Aff, ¶ 4.) ADC has final authority over the services provided within its prison facilities and the manner and method by which Trinity carries out its food service obligations. (Doc. 66 ¶ 17, Doc. 67 ¶ 2.) ADC prescribes the menus for all meals served to inmates, specifies the meal times, and requires Trinity to provide modified meal plans for inmates with religious or medical dietary restrictions and to serve those meals separately from the general population meals to ensure that they conform to the prescribed diets. (Doc. 66 ¶ 18, Doc. 67 ¶ 3.) ADC also requires Trinity to serve all meals on trays or in brown paper bags and to provide only plastic utensils. (*Id.*)

### 2. Religious Diets

ADC's food service policies require inmates requesting religious diets to seek approval from an ADC chaplain to receive such diets, and ADC—not Trinity—determines the propriety of the religious diets it prescribes. (Doc. 66 ¶ 19, Doc. 67 ¶ 5.) When inmates are approved for special diets, ADC issues them laminated diet cards, and Trinity distributes these cards to them. (Doc. 66 ¶ 20.) Trinity kitchen workers and staff also monitor inmates' compliance with special diet assignments, and inmates have been told to address immediate complaints about the content of their meals directly to Trinity kitchen personnel. (Doc. 87, Pl. Statement of Facts, ¶ 19; Doc. 37-9 at 2-3, 37-10 at 2, Doc. 87-3 at 48.) In addition, Trinity's Western Region Dietitian, Laura Donnelly, RO, analyzes the nutritional adequacy of its diets at ASPC-Eyman and has provided Statements of Nutritional Adequacy with respect to its kosher diet menus from at least June 2012 to January 2016. (Doc. 87 ¶ 19, Doc. 67 ¶ 12, Doc. 67-2 at 13-17.)

### 3. Kosher Menus and Meal Preparation

Trinity provides kosher diet meals according to a two-week rotational menu. (Doc. 67 ¶ 11.) The meals on this menu do not contain any pork or pork derivatives,

---

**13.** Saddiq has had his kosher diet suspended at least three times during this period, and ADC's diet records show that, as of March 4, 2016, his kosher diet was suspended. (Doc. 67 ¶¶ 7, 10; Doc. 87 ¶ 21.) It is unclear if he receives a kosher diet at this time.

and dairy products are never served with the same meals as meats, such as chicken and fish. (*Id.*) According to Mark Dolan, the Food Service Director for Trinity at ASPC-Eyman, all kosher diet menus that have been used since August 2010 to the present were reviewed and given prior approval by a Rabbi as conforming to kosher dietary standards and by Trinity's dietitian as conforming to pertinent nutritional guidelines. (*Id.* ¶ 12, Doc. 67-2 at 13-17.)[14]

Apart from foods such as eggs, fresh fruits and vegetables, and other items that are considered inherently kosher, Trinity only includes foods in its kosher menus that are certified by a recognized Orthodox kosher standard and come marked with a symbol such as: "OU" (Union Orthodox Jewish Congregations), "K" (Kosher), or "CRC" (Chicago Rabbinical Counsel). (Doc. 67 ¶ 13.) Prepackaged individual-service items, such as sugar packets, snack bars, and salad dressings, are not individually marked but come in bulk packages containing a symbol that they are kosher certified. (*Id.*) TV-dinner style meals that are part of the kosher menu come from a certified kosher supplier in individual plastic containers with cellophane seals, and each meal is individually wrapped in two layers of cellophane and stamped with a packaging date. (*Id.*) Other than the kosher foods it purchases in bulk, such as eggs, beans, fruit, and bread, Trinity uses only kosher foods that come from its suppliers in ready-to-eat single-serve containers. (*Id.* ¶ 14.)

To avoid spoliation or contamination, items served in the kosher diet are delivered twice a week and used up in the order they come in. (*Id.* ¶ 15.) Deliveries containing broken packaging or partially defrosted foods are not accepted, and foods are always stored at least six inches above the floor. (*Id.*) Trinity employees all receive training in proper food handling from the National Restaurant Foundation's Serve Safe Program and are required to complete its Safe Staff Food Handler Certificate Program to participate in staff meetings concerning food preparation, handling, and service. (*Id.*)

Trinity prepares and serves its kosher diet meals according to specific guidelines created by ADC and a Rabbi ("the Guidelines"), which require that they be prepared separately from non-kosher meals by Trinity employees or inmate kitchen workers who are trained in the proper preparation and handling of kosher foods. (*Id.* ¶ 16.) Trinity first served kosher meals on Styrofoam or cardboard trays, but, after consulting with its Rabbi, ADC instructed Trinity to serve these meals on regular meal trays wrapped in cellophane. (*Id.* ¶ 17.) The cellophane ensures that the foods do not come into direct contact with the trays. (*Id.*) After a meal is placed on the tray, it is wrapped in another layer of cellophane to further preserve the kosher integrity of the meal. (*Id.*) Once placed on the wrapped trays or in paper bags, the meals are stored on a shelf designated solely for kosher diet meals in the kitchen's walk-in freezer until served. (*Id.* ¶ 18.)

Kosher diet meals are prepared on a table used exclusively for special diet meals. (*Id.* ¶ 19.) In accordance with the Guidelines, the table-top is cleaned with a chemical sanitizer and wrapped in cellophane prior to the preparation of kosher meals. (*Id.*) A Trinity employee or inmate

**14.** Saddiq disputes that a Rabbi reviewed and approved Trinity's kosher diet menus on the ground that Trinity does not provide a Rabbinical Certification or the name or signed declaration of the Rabbi to support Dolan's assertions. (Doc. 87 ¶ 22.) As the Food Service Director at ASPC-Eyman, however, Dolan is competent to testify on these matters (Doc. 67 ¶ 1.), and his statements based on personal knowledge are admissible evidence of these facts. *See* Fed. R. Civ. P 56(c)(4).

kitchen worker obtains the necessary supplies to prepare the foods and portions out the foods onto cellophane-wrapped trays or into paper bags for service along with a disposable utensil and Styrofoam cup. (*Id.*)[15]

Eggs are boiled in a kosher-designated pot and placed in a plastic bag or wrapped in cellophane before they are placed onto a meal tray or into a paper bag. (*Id.* ¶ 20.) Hot items, such as beans and hot cereal, are also prepared only in a kosher-designated pot and placed into a plastic bag or a lidded Styrofoam container and placed on a warming cart until served. (*Id.*) When kosher TV-dinner style meals are part of the menu, a kitchen worker obtains the meals from the freezer, checks the dates stamped on the packaging, and heats them according to the supplier's directions, then places them on a warming cart for service. (*Id.*) In order to avoid puncturing the interior seal and the exterior cellophane wrapping, Trinity does not measure the temperature of these meals prior to serving them. (*Id.* ¶ 21) Items that are not delivered in prepackaged containers are portioned out and placed in a plastic sandwich bag, wrapped in cellophane, or placed into a Styrofoam container, then placed on a cellophane-wrapped tray or into a paper bag. (*Id.*) Servers use kosher-designated measuring scoops and scales to determine the correct portions of these items. (*Id.*) After all the kosher meals have been prepared, a Trinity staff member inspects them and corrects for any discrepancies before a final layer of cellophane is wrapped around each serving tray. (*Id.*)

Trinity is permitted, presumably by ADC, to deviate from its precise kosher menus when necessary due to issues with food availability or security, but it does not substitute kosher items with non-kosher items from the regular diet menu. (*Id.* ¶ 22.) Trinity used to provide fresh fruit in its kosher menu, but ADC required it to switch to canned fruits to prevent inmates from taking fruit from the dining hall and using it to brew alcohol. (*Id.* ¶ 23.) Trinity also switched from serving uncooked whole vegetables, which the inmates complained they could not cut, to serving uncooked sliced vegetables. (*Id.* ¶ 24.)

Saddiq has filed a number of grievances regarding Trinity's provision and service of its kosher diet meals, including that Trinity uses spoiled hot entrees, inedible frozen foods, and rotten vegetables, and it serves kosher meals on non-kosher trays instead of on Styrofoam trays. (*Id.* ¶¶ 90–92, 95.)

### B. Discussion

■ Trinity argues that Saddiq's dissatisfaction with its kosher meal service does not amount to a substantial burden under RLUIPA because the record contains no evidence showing anything more than occasional or sporadic food service issues and a lack of variety in its kosher menus, which are no more than *de minimis* inconveniences. (Doc. 72 at 24–26.)[16] The Court

15. Saddiq claims in his Statement of Facts that it is well known by ADC kitchen staff and inmate workers that "the diet meals, regardless of being medical or religious, are prepared on the same stove, table top, and with utensils used for <u>all</u> diets prepared in the respective 'diet cook's area.'" (Doc. 87 ¶ 11.) To the extent Saddiq means that the table top used for kosher meal preparation is the same one used for all special diet meals, this does not conflict with the evidence Trinity puts forth. Saddiq does not point to any evidence to support his assertions that Trinity uses the same stove and utensils for all special diet meals.

16. Trinity devotes the bulk of its Motion to other arguments, including that Saddiq is not entitled to injunctive relief or compensatory or punitive damages, Trinity is not a state actor for purposes of RLUIPA, and Trinity is nonetheless shielded by qualified immunity. (Doc. 72.) Because the Court is able to resolve

agrees that the evidence does not support Saddiq's allegations that Trinity regularly serves spoiled, inedible, contaminated, or religiously-forbidden foods. In his affidavit, Saddiq asserts that, since he began receiving a kosher diet in 2008, "Trinity consistently mishandled, poorly prepared, or neglected to respect halal or kosher integrity and dietary standards that are protected observances and tenets of orthodox Islam's dietary laws and the Orthodox Muslim practice of my sincerely held belief." (Doc. 87-1 ¶ 3.) But this statement is too vague and conclusory to create a genuine issue of material fact that Trinity violated specific Islamic religious tenets in its meal preparation or, if it did, that its infractions were serious enough or happened often enough to create a substantial burden. The affidavits of other inmates to which Saddiq points—without specific citations—are similarly lacking in factual detail. (*See* Doc. 82 at 23.) The content of these affidavits is mostly identical and includes only a general statement that Trinity "has served rotten vegetables, undercooked beans and frozen portions on its kosher/halal diet trays." (*See* Doc. 87-1 at 18, 20, 22, 24-27, 29, 31, 33, 35.) Saddiq also points generally to numerous grievances he filed to verify that he frequently made food service complaints (Doc. 87 at 18), but—as previously noted—grievances are only evidence that an inmate submitted complaints and of what he stated in them; they are not evidence of what actually occurred.[17] On the current record, Trinity has put forth sufficient evidence to show it provides kosher

meals that conform to national nutritional standards and applicable religious dietary restrictions, and Saddiq has failed to put forth sufficient evidence to create a genuine issue of material fact that it fails to do so.

The only remaining bases for Saddiq's RLUIPA claim against Trinity are that it purchases only kosher-certified meals—which may contain some non-halal ingredients—instead of halal-certified meals, and it uses cellophane-wrapped trays instead of Styrofoam trays. These facts are not in dispute. Saddiq asserts that these practices burden his sincerely held religious beliefs because the use of non-halal ingredients violates the halal integrity of his meals, and the kitchen staffs handling of successive non-halal trays during wrapping, even with gloves, makes the wrapped trays and the foods that touch them no longer halal. (Doc. 87 ¶ 60.)

■■■■ Construed in a light most favorable to Saddiq, these facts are sufficient to create a genuine issue of material fact that some of the practices Trinity follows in providing kosher diet meals impose a substantial burden on his sincerely held religious beliefs. Resolving this issue in favor of Saddiq, as the Court must at this stage of the proceedings, Saddiq's claim nonetheless fails because the burdens he complains of are not fairly attributable to Trinity. As to the provision of only kosher-certified instead of halal-certified meals, the undisputed facts show that ADC—not

the Motion on the merits of Saddiq's claim, it will not address these additional arguments.

**17.** In his Statement of Facts, Saddiq primarily recounts numerous grievances he has filed, many of which pertain to suspensions from his religious diet or the alleged retaliatory conduct of specific individuals and are unrelated to the quality and religious integrity of Trinity's kosher diet as alleged in Count One of the TAC. (*See, e.g.,* Doc. 87 ¶¶ 19, 30, 41.)

Even if some of the attached grievances relate to this claim, Saddiq relies primarily on citations to his grievances or the affidavits of other prisoners as a whole to make his case for him; he does not point to specific portions of this evidence to support the facts alleged; nor does he attest to or point to any evidence outside of his grievances and the sworn statements already discussed to support his RLUIPA claim.

Trinity—determines which religious diets to provide. (Doc. 67 ¶¶ 3, 5.) Further, Saddiq's settlement agreement with ADC shows that he accepted a kosher diet in 2008, and he did so on the terms that he would receive a halal diet instead only if ADC provided such a diet in the future. (*See* Doc. 87-1 at 42.) Saddiq has not put forth any evidence that ADC now offers a halal diet or that Trinity has otherwise been contracted to provide a halal diet to him. As to Trinity's use of non-halal trays, the evidence shows ADC requires Trinity to use cellophane-wrapped trays instead of Styrofoam ones, and ADC made this change in consultation with a Rabbi. (Doc. 67 ¶ 17.) To the extent Saddiq bases his RLUIPA claim against Trinity on actions solely attributable to ADC, this claim fails.

For the foregoing reasons, the Court will grant summary judgment to Trinity on Saddiq's RLUIPA in Count One.

## V. Additional Motions

After Trinity filed its reply, Saddiq filed a "Motion to Strike Declaration of Laura Donnelly and Plaintiff's Objection to Newly Introduced Evidence" (Doc. 101) and a "Motion for Leave to Reopen Response Brief with Supporting Statement of Facts" (Doc. 102). Saddiq moves, respectively, for the Court to strike Trinity's newly introduced facts and evidence submitted for the first time in its reply and to provide him an opportunity to respond to the newly introduced evidence. Trinity objects to both Motions. (Docs. 103, 104.)

Because the Court has resolved Trinity's Motion for Summary Judgment on the merits of Saddiq's RLUIPA claim and not on any evidence Trinity sets forth in its reply or its newly introduced affidavit, the Court will deny the Motion to Strike and the Motion to Reopen as moot.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Ryan's and Vicklund's (State Defendants') Motion for Summary Judgment (Doc. 55), Defendant Trinity's Motion for Summary Judgment (Doc. 72), Plaintiff's "Motion to Strike Declaration of Laura Donnelly and Plaintiff's Objection to Newly Introduced Evidence" (Doc. 101), and Plaintiff's "Motion for Leave to Reopen Response Brief with Supporting Statement of Facts" (Doc. 102).

(2) State Defendants' Motion for Summary Judgment (Doc. 55) is **granted**.

(3) Trinity's Motion for Summary Judgment (Doc. 72) is **granted**.

(4) Plaintiff's Motion to Strike (Doc. 101) and Motion to Reopen (Doc. 102) are **denied as moot**.

(4) This action is **terminated** with prejudice. The Clerk of Court must enter judgment accordingly.