Benjamin **FREEMAN**, Plaintiff–Appellant,

v.

Joe **ARPAIO**, Sheriff; Officer York, Maricopa County Sheriffs Office Detention Officer; Officer Rodgers; Officer Steward; Officer Tipton; Officer Vard; Officer Keaton; Maricopa County Sheriffs Office Detention Officers; Sgt. Greening, aka Greeny, Defendants–Appellees.

No. 96–15551.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 1997.

Decided Sept. 9, 1997.

---

Edward M. Mansfield, Belin, Harris, Lamson & McCormick, Des Moines, IA, for plaintiff-appellant.

Susan Sherwin, Deputy County Attorney, Office of Maricopa County Attorney, Phoenix, AZ; Janis M. Haug, Deputy County Attorney of Counsel, Office of Maricopa County Attorney; John W. Paulsen, Deputy County Attorney, Office of Maricopa County Attorney, Phoenix, AZ, for defendants-appellees.

Before: CHOY and HALL, Circuit Judges, and SHADUR, District Judge.*

CHOY, Circuit Judge:

Arizona state prisoner Benjamin Freeman appeals the district court's summary judgment dismissal in favor of prison officials in his 42 U.S.C. § 1983 action. On June 20, 1994, Freeman, a Muslim, filed a complaint pro se against officials of Maricopa County Jail ("defendants") alleging that his constitutional rights to free exercise of religion and equal protection were violated because he was not allowed to practice his religion and was discriminated against on the basis of his faith. Defendants moved for summary judgment, which was granted on February 27, 1996. Freeman timely appealed and counsel was appointed for him. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse and remand in part.

## FACTUAL ASSERTIONS

Freeman, a practicing Muslim, was held at the Maricopa County Jail from December 19, 1993 to August 12, 1994. At Maricopa County Jail, Muslim Jumah services were scheduled to be held at 10:00 a.m. on every Thursday. Maricopa County Jail had entered into an agreement with Masjud Jauharatul–Islam to provide an Imam to perform the services for a fee of $15 an hour.

Freeman submitted affidavits from himself and several other inmates stating that on numerous occasions, prison officials refused

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

to let Muslim inmates attend the weekly services. Freeman also submitted a Headcount Roster in support of his claim that he was prevented from attending several Jumah services. The prisoners' affidavits also state that only Muslim inmates were handcuffed or shackled on their way to services and were the only ones required to sign attendance sheets. Furthermore, the affidavits state that Muslim inmates were not given the customary 10–15 minute notice prior to services, that was given to inmates of other faiths, and that Muslim inmates were subjected to abusive epithets by prison officials.

Defendants submitted evidence regarding the prison's policy on cuffing and shackling prisoners for movement within the institution. The prison's guidelines stated that the use of cuffs and shackles for minimum to medium security inmates is discretionary. Sergeant Greening stated that cuffs and/or shackles are used for security purposes whenever there are enough cuffs and/or shackles for the entire inmate group being moved. She also stated in response to Freeman's interrogatories, however, that cuffs and/or shackles normally are not used unless an inmate has been disruptive. Two different affiants testified as to the number of shackles available at the prison; one claimed there were no more than three available and the other affiant stated there were between four and six.

Defendants further submitted evidence that the Imam hired to perform Muslim services was absent on numerous occasions due to personal problems beyond the control of the prison. Finally, defendants' affiant stated that no sign-up sheets were required at any religious services.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Bagdadi v. Nazar,*

84 F.3d 1194, 1197 (9th Cir.1996). Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. *Jung v. FMC Corp.,* 755 F.2d 708, 710 (9th Cir.1985); Fed.R.Civ.P. 56. Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party. *Id.*

## DISCUSSION

## I. FREE EXERCISE OF RELIGION

Freeman claims the district court erred in granting summary judgment in favor of defendants. He maintains that genuine issues of material fact exist as to whether his First Amendment right to free exercise of religion was violated by defendants, who allegedly denied him access to weekly Islamic services and placed burdens on the practice of his religion, such as shackling him during transport to services,[1] failing to give him advanced notice of services so that he could make the required "wudu",[2] requiring him to sign attendance sheets at services, and subjecting him to abusive language directed at his faith.

### A. *Applicable Standard:* RFRA and *Boerne v. Flores*

On June 25, 1997, the United States Supreme Court held unconstitutional the Reli-

---

**1.** Prior to the appointment of counsel for Freeman, he filed pro se a Reply Brief in which he conceded the shackling issue. He stated: "Plaintiff being a pro se litigant hereby stipulate [sic] that he concedes and relinquishes the handcuffing and shackling of Muslims on the grounds that this issue is not germaine [sic] to this instant case. *It is not that these incidents did not occur,* it is only a fact that is not needed to prove invidious discrimination, religious animus and equal protection of the laws." (emphasis added).

In light of the wide latitude given pro se litigants in appellate briefing, we permit Freeman to proceed with this claim. *See Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir.1990) (stating that pro se appellate briefs are liberally construed to ensure litigant does not lose right to hearing on the merits, especially where civil rights are at issue).

**2.** A cleansing of the body required before Jumah.

gious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb–4 (1993), as an act in excess of Congress' authority under section 5 of the Fourteenth Amendment. *City of Boerne v. P.F. Flores,* — U.S. —, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). RFRA had reestablished the "compelling state interest" test as the standard applicable to free exercise of religion claims. 42 U.S.C. § 2000bb(b) (1993). Specifically, RFRA required that laws substantially burdening an individual's exercise of religion must be in furtherance of a compelling government interest and must be the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1. RFRA was enacted in direct response to the Supreme Court's decision in *Employment Division Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which held that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *Boerne,* — U.S. at —, 117 S.Ct. at 2161 (citing *Smith,* 494 U.S. at 885, 110 S.Ct. at 1604). RFRA not only superseded *Smith,* but it also replaced the standard used in prisoners' free exercise challenges. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (prison regulation need only be "reasonably related to legitimate penological interests."); *O'Lone v. Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987) (prison regulations judged under less restrictive reasonableness standard). But the decision in *Boerne* restored the reasonableness test as the applicable standard in free exercise challenges.

■ In order to establish a free exercise violation, Freeman must show the defendants burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith,[3] without any justification reasonably related to legitimate penological interests. *See Turner,* 482 U.S. at 89, 107

S.Ct. at 2261–62. In determining whether the challenged conduct was reasonable, the court should consider several factors such as whether the regulation has a logical connection with a legitimate government interest, whether alternative means exist to exercise the asserted right, and the impact that accommodation of the prisoner's right would have on prison resources. *O'Lone,* 482 U.S. at 350–52, 107 S.Ct. at 2405–06 (citing *Turner,* 482 U.S. at 84–89, 107 S.Ct. at 2259–62).

**B.  *Analysis***

■ The district court analyzed Freeman's free exercise claim under the RFRA standard and held that no genuine issues of fact existed to prove that Freeman's right to practice his religion was substantially burdened. In light of *Boerne,* we need not address that conclusion. Instead, having reviewed Freeman's claim under the pre-RFRA standard articulated in *Turner* and having considered the evidence in the light most favorable to him, we find that Freeman does raise genuine issues of material fact sufficient to defeat summary judgment on whether he was denied access to religious services without reasonable justification. Freeman set forth specific facts that he and other Muslim inmates were prevented from attending Jumah services, as mandated by their religion,[4] by prison officials who refused to open their cells while services were being conducted.

Defendants argue that Freeman was never denied access to religious services actually being conducted but that several services were canceled due to the absence of the Imam hired to provide Islamic services to the Muslim inmates. This justification arguably would satisfy *Turner* reasonableness. However, a genuine issue exists as to whether the dates of the Imam's absence coincide with the dates Freeman claims he was prohibited from attending services. For dates that do not coincide, defendants have not given any

---

**3.** *See Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987) (stating that government action burdens a prisoner's practice of his religion if he is prevented from engaging in conduct mandated by his faith), *aff'd sub nom., Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1989).

**4.** *See O'Lone,* 482 U.S. at 345, 107 S.Ct. at 2402–03 (finding that attendance at weekly Jumah service is commanded by the Koran) (citing Koran 62:9–10).

reasonable justification related to legitimate penological interests for refusing to open Freeman's cell doors while Islamic services were being held.

■ As for his claims with respect to shackling, failure to give notice allowing time for "wudu", the sign-in requirement, and the abusive language, we hold they do not amount to a violation of his constitutional rights.[5] None of these allegations, even taken in the aggregate, amount to a substantial burden on the free exercise of his religion. In order to reach the level of a constitutional violation, the interference with one's practice of religion "must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir.1987). Although such conduct may have inconvenienced Freeman in the practice of his religion, it did not prevent him from participating in the mandates of his religion.

## II. EQUAL PROTECTION

Freeman also contends that the district court erred in granting summary judgment on his equal protection claim because genuine issues of material fact existed as to whether he was treated differently from other inmates on the basis of his faith. His equal protection claim stems from a number of allegations, including that (1) only Muslim inmates were denied access to weekly religious services; (2) only Muslim inmates were shackled as they were transported to religious services; (3) only Muslim inmates were not alerted that their services were going to commence; (4) only Muslim inmates were required to sign-in at religious services; and (5) only Muslim inmates were called abusive names directed at their religion.

### A. *Applicable Standard*

■ Prisoners enjoy religious freedom and equal protection of the law subject to restrictions and limitations necessitated by legitimate penological interests. *Bell v. Wolfish*, 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979). The Constitution's equal protection guarantee ensures that prison officials cannot discriminate against particular religions. *See Cruz v. Beto*, 405 U.S. 319, 321–22, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972) (per curiam). Prisons must afford an inmate of a minority religion "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Id.* at 322, 92 S.Ct. at 1081. Prisons need not provide identical facilities or personnel to different faiths, *see id.* at 322 n. 2, 92 S.Ct. at 1081 n. 2, but must make "good faith accommodation of the [prisoners'] rights in light of practical considerations." *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir.1987) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir.1970)). To succeed on an equal protection claim, a plaintiff in a section 1983 claim must show that officials intentionally acted in a discriminatory manner. *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir.1991); *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1112 (9th Cir.1991) (stating that discriminatory intent can sometimes be inferred by mere fact of different treatment).

To defeat summary judgment, therefore, Freeman "must set forth specific facts showing that there is a genuine issue" as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths and that such conduct was intentional. *See* Fed.R.Civ.P. 56(e). We find that Freeman succeeds in establishing genuine issues of material fact as to whether he was given a reasonable opportunity to pursue his faith compared to other inmates by being denied access to religious services and by being shackled on his way to services.

### B. *Analysis*

#### 1. Access to Religious Services

■ Freeman submitted affidavits claiming that on numerous occasions prison offi-

---

**5.** Although performing "wudu" before Jumah services may be a requirement of the religion, defendants' failure to give a 10–15 minute warning that services were to begin did not prevent Freeman from performing the necessary cleaning ritual, especially in light of the fact that Jumah was conducted at the same time every Thursday and Freeman could have prepared himself accordingly.

cials simply refused to open Muslims' cell doors, preventing them from attending their religious services. Such conduct, the affiants claim, was not directed at inmates of other faiths. We find this sufficient to raise a genuine issue as to whether Muslim inmates' access to Islamic services is reasonable in comparison to the access of other inmates to their religious services.

### 2. Use of Shackles

■ The practice of using shackles at Maricopa County Jail is in dispute. Sgt. Greening stated in an affidavit, dated June 20, 1995, that "cuffing and/or shackling inmates is recommended whenever there are cuffs available." She further remarked that all decisions whether or not to use shackles are left to the discretion of the officers and are made with deference to the security of the prison and not with reference to the nature of the activity requiring inmate movement. However, on September 11, 1995, Sgt. Greening responded to an interrogatory regarding the practice of shackling inmates, to which she stated:

> It is not a normal practice to shackle inmates during intrafacility movements. Normally an inmate(s) is shackled because the inmate(s) has been disruptive. Inmates are cuffed when enough cuffs are available for the entire group of inmates being escorted. when [sic] there is [sic] not enough cuffs for the entire group, extra officers are needed to secure various posts for the movement.

The policy guideline "[f]or minimum and medium security inmates, [is that] the application of handcuffs and the use of an escort officer will be discretionary."

Although the policy for using shackles is somewhat unclear, the purpose behind using them is not. Sgt. Greening stated that prisoners are shackled because the prison complex has "a large yard with a lot of open space between the housing units" so cuffs are preferred to keep prisoners in line. The decision to shackle inmates is rationally related to the prison's legitimate penological

interest in keeping prisoners in line while in the yard. However, Freeman submitted evidence that only the Muslim prisoners were shackled on their way to religious services. How are prisoners of other minority faiths, such as followers of Judaism or of Native American faiths, moved to and from their religious services? Are they likewise shackled, therefore, supporting defendants' contention that shackles are used in keeping with security concerns when there are enough for the entire inmate group being moved? Or are they merely escorted, therefore bolstering Freeman's claim that Muslim inmates are being treated differently in violation of equal protection?

We find that Freeman's evidence of such disparate treatment is sufficient to raise a genuine issue of fact as to whether he was given a reasonable opportunity to pursue his faith as compared to inmates of other faiths.

### 3. Notice, Sign–In Sheets, Abusive Language

■ Even without receiving the customary 10–15 minute notice prior to services, we hold that Freeman has a reasonable opportunity to pursue his faith comparable to the opportunity afforded other prisoners who are given the customary alert and that requiring him to sign attendance sheets does not implicate his opportunity to pursue his faith.

■ As for being subjected to abusive language directed at his religious and ethnic background, " '[v]erbal harassment or abuse ... is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.' " *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987) (quoting *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir.1979)).[6] We hold, therefore, that Freeman fails to raise a genuine issue as to a constitutional violation on the basis of the alleged abusive epithets.

### CONCLUSION

On Freeman's First Amendment freedom of religion claim, we reverse the district court's grant of summary judgment to the

---

**6.** Although not itself rising to the level of a constitutional violation, prison officials' use of abusive language directed at an inmate's religion may be evidence that prison officials acted in an intentionally discriminatory manner. *Cf. Sischo–Nownejad,* 934 F.2d at 1112.

extent that we find Freeman raises genuine issues of material fact as to whether he was denied access to religious services without reasonable justification. On Freeman's equal protection claim, we reverse the district court's grant of summary judgment to the extent that we find there are genuine issues of material fact: (1) that shackling of Muslim prisoners was discriminatory and not for penological reasons, and (2) that Muslim prisoners were deprived of equal access to religious services. Otherwise, we affirm the district court's grant of summary judgment under the standards set out in *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261 (prison regulation need only be "reasonably related to legitimate penological interests"), and *O'Lone,* 482 U.S. at 349, 107 S.Ct. at 2404–05 (prison regulations judged under less restrictive reasonableness standard).

**AFFIRMED in part REVERSED in part. Each side shall bear their own costs.**