FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL RAY FUQUA, AKA
Michael Fuqua,

*Plaintiff-Appellant*,

v.

RAAK, Psychologist; D. WEBSTER,
Ph.D.; HIGUERA; JONES; SUCKLE,
Captain; TROMAN, CO III;
MOONEY, D.W.; GOLDER, ADW;
SHAW, Ph.D.; SWIRSKY, Captain;
HUDSON, CO III; HORN, Lt.;
METZLER, CO IV; RUSSLE, CO III;
MCGEE, Ph.D.; KRAATZ, ADW;
OSHITA, Lt.; SWAYNE, CO III;
CHARLES L. RYAN; BAKER,
Captain; VAN DER NOORD, Sgt.;
LUFT, Sgt.; HALL, Sgt.; GRIMES,
Sgt.; GONZELEZ, Sgt.; D. LABAR,
AFHA; K. RODGERS, FHA;
LOREN, Sgt.; OSHITA, CO IV;
KIRKOFF, D.W.; C. CATRELL,
D.W.; MOVA, CO II; GANT, CO III;
MCCHESNEY, CO IV; ROXANNE
HILL, D.W.; COCA, CO III; J. LIND,
Chaplain; MACLARENS, Chaplain;
KINGSLAND, Sr. Chaplain;

No. 21-15492

D.C. No. 2:18-cv-
02337-DJH

OPINION

THOMAS, Chaplain; PUCKET, Lt.;
BAKER, Sgt.; RODE, Deputy
Warden,

*Defendants-Appellees*.

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted December 7, 2023
San Francisco, California

Filed November 1, 2024

Before:  Daniel P. Collins, Danielle J. Forrest, and Jennifer
Sung, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### Prisoner Civil Rights / Religious Diet

In an action brought by Arizona state inmate Michael
Ray Fuqua alleging that prison chaplain Jeffrey Lind denied
his request for a religious dietary option, the panel reversed
the district court's grant of summary judgment to Lind on

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Fuqua's First Amendment Free Exercise and Fourteenth Amendment Equal Protection Clause claims and affirmed the district court's grant of summary judgment to Lind on Fuqua's Religious Land Use and Institutionalized Persons Act ("RLUIPA") claim.

Fuqua describes himself as an "adherent to the Christian-Israelite beliefs," which he asserts are a "subset of [the] Christian Identity" faith. He requested to be placed on the list to observe "Passover and Feast of Unleavened Bread," which Lind denied. The district court found that Fuqua failed to raise a triable issue that the denial substantially burdened his religious exercise or that Lind treated him differently from members of other faiths. With respect to Fuqua's RLUIPA claim, the district court relied on an alternative ground for granting summary judgment to Lind, namely, that RLUIPA only authorizes equitable relief and Fuqua's equitable claims were moot.

Addressing Fuqua's First Amendment and RLUIPA claims, the panel concluded that a reasonable trier of fact could find that Fuqua was denied his requested dietary accommodation, not based on his failure to follow a neutral and valid procedural rule for requesting accommodations, but rather based on Lind's own theological assessment of the correctness and internal doctrinal consistency of Fuqua's belief system. Denying accommodation on such grounds, taken together with the averred practical monetary and physical consequences, sufficed to establish a substantial burden. Because this ground was the only basis for the district court's grant of summary judgment on Fuqua's First Amendment claim, the panel reversed the district court's summary judgment in favor of Lind on the First Amendment claim.

Addressing Fuqua's Equal Protection claim, the panel concluded that a factfinder could reasonably conclude that Lind failed to make a "good faith accommodation" of Fuqua's request for a dietary option that was already being made available to members of another denomination and that Lind intentionally acted because of subjective antipathy towards Fuqua's belief system. Accordingly, the panel reversed the district court's summary judgment in favor of Lind on Fuqua's Equal Protection claim.

The panel affirmed the district court's grant of summary judgment to Lind on Fuqua's RLUIPA claim based on the district court's alternative ground that RLUIPA only authorizes equitable relief and Fuqua's equitable claims were moot. The panel held that this court's decision in *Wood v. Yordy*, 753 F.3d 899 (9th Cir. 2014), forecloses suits seeking monetary damages under RLUIPA against state officers, and Fuqua conceded that that any equitable claim he may have under RLUIPA was moot. Accordingly, Fuqua's RLUIPA claim failed as a matter of law.

---

## COUNSEL

Daren G. Zhang (argued), Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C., for Plaintiff-Appellant.

Rebecca A. Banes (argued), Patrick J. Boyle, and William M. Horne, Assistant Attorneys General; Mark Brnovich, Former Arizona Attorney General; Kristin K. Mayes, Arizona Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; for Defendants-Appellees.

Adeel A. Mangi, Jacob I. Chefitz, and Bharath Palle, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amici Curiae 24 Religious Organizations.

Noel J. Francisco and Yaakov M. Roth, Jones Day, Washington D.C.; Kelly C. Holt, Jones Day, New York, New York; Eric C. Rassbach, The Hugh and Hazel Darling Foundation, Religious Liberty Clinic, Pepperdine University Caruso School of Law, Malibu, California; for Amicus Curiae Byron Johnson.

## OPINION

COLLINS, Circuit Judge:

Plaintiff-Appellant Michael Ray Fuqua is an inmate in the Arizona state prison system. He contends that, in denying his request for a religious dietary option that was made available to other prisoners and that Fuqua claimed was also mandated for him by his distinct religious faith, the prison chaplain (Defendant-Appellee Jeffrey Lind) violated Fuqua's rights under the Free Exercise Clause, the Equal Protection Clause, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). We reverse the district court's grant of summary judgment to Lind on Fuqua's Free Exercise and Equal Protection claims, because those claims raise triable issues of material fact. Although the same triable issues are also present with respect to Fuqua's RLUIPA claim, our decision in *Wood v. Yordy*, 753 F.3d 899 (9th Cir. 2014), forecloses suits seeking monetary damages under RLUIPA against state officers, and any equitable claims that Fuqua may have against Lind under

RLUIPA are moot. We therefore affirm the summary judgment in Lind's favor on Fuqua's RLUIPA claim.

**I**

In January 2017, Michael Ray Fuqua was incarcerated at the Arizona State Prison Complex in Safford ("ASPC-Safford"), which is run by the Arizona Department of Corrections ("ADC"). Fuqua describes himself as an "adherent to the Christian-Israelite beliefs," which he asserts are a "subset of [the] Christian Identity" faith. A central tenet of this faith, as Fuqua describes it, is that persons of European descent are actually descendants of the 10 northern tribes of Israelites who were conquered by the Assyrians.

Inmates at ASPC-Safford are given the opportunity to practice their chosen religion by designating a religious preference for which they can obtain privileges and accommodations, including religious diets. The ADC offers kosher and vegan religious diet plans to inmates, as well as a temporary "certified kosher-for-Passover" diet. In January 2017, on the advice of other prison staff regarding how to obtain a religious dietary accommodation, Fuqua sent a letter to Senior Chaplain Jefferey Lind stating that, in light of his Christian-Israelite beliefs, he wanted "to be placed on the list to observe the upcoming Passover and Feast of Unleavened Bread in order to follow my religious beliefs."

On February 3, 2017, Lind responded to Fuqua, informing him that his request "could not be approved at that time" because he "did not identify the 'list' in his request" and "did not provide published documentation from his religious preference substantiating the request." Days later, Fuqua wrote another letter to Lind explaining that the "list" referred to the list that the prison provides to its food contractor of those inmates who would be receiving

"Passover/Feast of Unleavened Bread" meals. The letter also requested that Lind meet with Fuqua to discuss the request and to review the materials he had about his faith.

After meeting with Fuqua in person on February 9, 2017,[1] Lind concluded that Fuqua was "unable to articulate what his religious reasons for a Kosher for Passover Diet were." Fuqua avers that, during this meeting, Lind became visibly upset, raised his voice, and told Fuqua that his Christian-Israelite beliefs were false. That same day, Fuqua sent Lind a follow-up letter with further supporting materials in an effort to substantiate the religious basis for his requesting to be placed on the list for Passover meals.

On February 16, 2017, Lind sent a response to Fuqua informing him that his request was not substantiated by the additional materials he had provided and therefore could not be approved at that time. Lind stated that, in his view, the Christian Identity faith's teachings about descent from the tribes of Israel are wrong.[2] Lind further explained that one of the newsletters Fuqua had sent, which was from a group in Virginia, did not state that kosher or Passover meals should be observed. That newsletter, Lind stated, suggested a different type of "memorial" service using items such as "flatbread" and "grape juice," which could be obtained from the prison commissary.

---

[1] Fuqua's complaint and his briefing refer to this date as "February 19," but given the surrounding chronological context in the complaint, that appears to be a typographical error. Lind stated that the meeting occurred on February 9.

[2] Lind later claimed in a declaration that his views as to the falsity of Fuqua's religious beliefs had no effect on his determination that Fuqua's request was unsubstantiated. However, as we explain below, a rational factfinder could reasonably conclude otherwise.

Dissatisfied with Lind's response, Fuqua submitted on February 20 an "Inmate Informal Complaint Resolution" form to Correctional Officer Coca. Fuqua's complaint summarized his previous exchanges with Lind, stated that he did not have to prove the validity of his sincerely held religious beliefs to Lind, and argued that accommodating his meal request would not be "a substantial burden to ADC."

On February 22, 2017, Lind submitted to Coca a three-page response to Fuqua's complaint. Invoking his "28 years" of familiarity with "people who adhere" to similar beliefs about descent from the tribes of Israel, Lind explained why, based on Scripture and the historical record, he thought that Fuqua's beliefs on that score were false. He acknowledged, however, that "people are free to believe as they decide in their personal lives." Lind also explained that the materials submitted with Fuqua's February 9 letter—"a book by Herbert W. Armstong and some newsletters from a group based in Virginia"—did not support either Fuqua's Israelite-descent beliefs or his request for kosher Passover meals. Lind rejected Fuqua's assertion that Lind was merely expressing his "opinion about Israel," stating that Lind's view of the matter was "substantiated by history," whereas "[t]he assertions by Fuqua and his printed materials are not documented by history." On that score, Lind noted that he distinguished between "published materials" and "printed materials," because "[a]nyone can print materials." Lind also reiterated his view that, based on the materials submitted, the belief system that Fuqua invoked did not observe or require traditional Passover meals. Rather, those materials promoted a "memorial service which consists of eating unleavened bread and grape juice." Lind concluded that Fuqua was using the submitted materials "as a pretext to receive approval to join a Jewish observance." Lind

underscored that he "did not refuse to approve [Fuqua's] requests," but simply concluded that they "cannot be approved at this time" based on the materials submitted.

Coca's formal response rejecting Fuqua's complaint stated that Lind had not denied Fuqua's request but had simply concluded that he did not have enough support for the request to approve it "at this time." Coca's response informed Fuqua that if he wished to pursue the matter further, he could file a formal grievance. Fuqua did so on February 24, 2017, reiterating his requests. On March 8, 2017, Deputy Warden Roxanne Hill responded to Fuqua's official grievance, denying it on the basis that Lind had determined Fuqua's request to be "not substantiated." Fuqua appealed this decision, and on April 12, 2017, the ADC "Central Office," after consultation with the "Pastoral Administrator," affirmed Hill's denial of Fuqua's grievance. Apparently adopting Lind's view that Fuqua's belief system recommended a memorial service with unleavened bread and grape juice, the decision noted that these items were available for purchase in the commissary store.

Fuqua asserts that, as a result of the denial of his requested accommodation, he was "forced to starve for 8 days, lose 15 to 20 lbs," suffer "severe hunger pains," and was prevented from "properly purg[ing] [his] body of bacteria that is built up in the body per Biblical health, which causes long term health problems." He also states that he was forced to spend about $120 to $150 on commissary food as a result of ADC officials' "refus[al] to allow me to receive the same meals provided to other inmates for the same High

Sabbaths."[3]  However, Fuqua also contends that the matzo available in the commissary was inadequate for his purposes because it was explicitly marked as "not for Passover use."

As of January 2020, Fuqua was incarcerated at a different state prison, and officials there granted his requested dietary accommodation.

On July 23, 2018, Fuqua filed this action in the district court, asserting a variety of constitutional claims under 42 U.S.C. § 1983.  In particular, his operative complaint, which named multiple prison officials as Defendants, alleged violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as a violation of RLUIPA.  Fuqua sought monetary damages, as well as declaratory and injunctive relief.  The district court screened Fuqua's claims pursuant to 28 U.S.C. § 1915A(a) and ultimately dismissed all claims and Defendants except for three claims against Lind—namely, Fuqua's First Amendment Free Exercise claim, his Fourteenth Amendment Equal Protection claim, and his RLUIPA claim.

The district court denied Fuqua's motion for partial summary judgment (which was directed to his RLUIPA claim) and granted Lind's motion for summary judgment in full.  Regarding the First Amendment claim, the district court held that although a reasonable jury could conclude that Fuqua's belief was sincere, his proffered evidence failed to create a genuine dispute of material fact as to whether Lind had substantially burdened Fuqua's religious exercise. Regarding the RLUIPA claim, the district court similarly

---

[3] As a point of reference, Fuqua states that the prison's Work Incentive Pay Plan for inmates who work in the prison pays between $0.15/hour and $0.45/hour.

held that Fuqua had failed to raise a triable issue of substantial burden.  The court also held, in the alternative, that only injunctive relief was available under RLUIPA and that Fuqua's injunctive claims were mooted by the subsequent accommodation of his dietary requests. Regarding the Equal Protection claim, the district court held that Fuqua had failed to adduce sufficient evidence to show that Lind had treated him differently from members of other faiths and that, even if Lind had done so, Lind had shown a "legitimate state purpose for doing so."

Fuqua timely appealed from the ensuing judgment, and we have jurisdiction under 28 U.S.C. § 1291.[4]

## II

We first address whether the district court correctly held that Fuqua failed to present sufficient evidence to establish the elements of his First Amendment, RLUIPA, and Equal Protection claims.  We review the district court's decision to grant summary judgment de novo.  *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021).  We will uphold a summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the district court correctly applied the relevant law.  *Social Techs. LLC v.*

---

[4] We appointed counsel for Fuqua for purposes of this appeal, and counsel has filed a supplemental opening brief challenging the district court's summary judgment in favor of Lind on Fuqua's First Amendment, RLUIPA, and equal protection claims.  In an additional pro se opening brief, Fuqua also challenges the district court's dismissal, at the screening stage under 28 U.S.C. § 1915A(a), of his remaining claims against a variety of additional defendants.  We affirm the dismissal of these claims for substantially the reasons stated by the district court in its screening order.

*Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021). Summary judgment may be affirmed on any ground supported by the record. *Cruz v. National Steel & Shipbuilding Co.*, 910 F.3d 1263, 1270 (9th Cir. 2018).

## A

The Free Exercise Clause of the First Amendment, as made applicable to the States by the Fourteenth Amendment, forbids government from "prohibiting the free exercise" of religion. U.S. CONST. amend. I. Prisoners retain their religious freedom while incarcerated, subject to limitations "aris[ing] both from the fact of incarceration and from valid penological objectives." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *see also Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015). An inmate asserting a Free Exercise claim must first show that he or she has a sincerely held religious belief that was impinged by government action. *Jones v. Slade*, 23 F.4th 1124, 1144 (9th Cir. 2022); *see also Walker*, 789 F.3d at 1138. If the inmate makes such a showing, then the "burden shifts to the [defendant] to show that the regulation is reasonably related to legitimate penological interests." *Jones*, 23 F.4th at 1144 (citation omitted). In assessing whether the defendant has made this showing, we consider the factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987):

> (1) whether there is a valid, rational connection between a state interest and the prison regulation; (2) whether prisoners have an alternative method of engaging in religious practice; (3) the impact accommodation of the asserted constitutional right would have on guards and other

inmates; and (4) the absence of ready alternatives to the challenged regulation.

*Walker*, 789 F.3d at 1138–39 (citing *Turner*, 482 U.S. at 89–90); *see also Jones*, 23 F.4th at 1144.

Section 3(a) of RLUIPA also protects the religious rights of inmates. It provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to" a prison, "unless the government demonstrates that imposition of the burden on that person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."   42 U.S.C. § 2000cc-1(a).

Although the scope of the "religious exercise" protected by RLUIPA may be broader than what is protected by the Free Exercise Clause, *see Apache Stronghold v. United States*, 101 F.4th 1036, 1062–63 (9th Cir. 2024) (en banc), neither side here contests that the particular religious practices at issue are within the scope of the religious exercise protected by *both* provisions.   Moreover, neither side disputes that, if a prison requirement has been shown to impose a "substantial burden" for purposes of RLUIPA, that showing would also suffice to trigger the Free Exercise Clause, which would then require the defendant to satisfy the "reasonableness standard" that applies in the prison context under that clause.[5]  *Jones*, 23 F.4th at 1144; *see also id*. at 1134 ("Once a claimant demonstrates that the challenged

---

[5] We therefore have no occasion to address whether a prisoner must establish a "substantial burden" on free exercise, as opposed to some lesser showing, in order to trigger the applicability of the Free Exercise Clause in the prison context.

regulation impinges on his sincerely held religious exercise, the burden shifts to the government to show that the regulation is 'reasonably related to legitimate penological interests.'" (citation omitted)); *Turner*, 482 U.S. at 89. In the proceedings below, the district court held that Fuqua had failed to establish a "substantial burden" on his religious exercise and that his First Amendment and RLUIPA claims failed on that basis. Construing the record evidence in the light most favorable to Fuqua, we conclude that a reasonable trier of fact could find that Lind's actions substantially burdened Fuqua's religious exercise, and we therefore hold that the district court erred in granting summary judgment to Lind on these claims on that ground.

In explaining what counts as a "substantial burden" on religious exercise in the prison context for purposes of RLUIPA, we have held that the concept includes both direct burdens, such as "forbidding conduct that an inmate believes he is religiously compelled to do" or "compelling an inmate to do that which he believes he is religiously forbidden from doing," as well as indirect burdens, such as affording privileges in a way that "encourag[es] an inmate to do that which he is religiously prohibited or discouraged from doing" or that "discourag[es] an inmate from doing that which he is religiously compelled or encouraged to do." *Jones*, 23 F.4th at 1140; *see also Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005).

Here, Fuqua requested a festival-related meal option that was already being made available to other inmates and that he sincerely contended was mandated by his faith. Fuqua also asserts that the refusal to provide him with the requested diet required him, by virtue of his religious beliefs, to either forego eating for eight days or to pay substantial amounts of money to purchase what limited food was available in the

commissary that would be consistent with his religious obligations. In the absence of some countervailing consideration, we would have little difficulty in concluding that the refusal to provide Fuqua the requested dietary option constituted a substantial burden on his religious exercise. *See Shakur v. Schriro*, 514 F.3d 878, 882, 888–89 (9th Cir. 2008) (holding that a prison imposed a substantial burden on a Muslim inmate's religious exercise by refusing to make available to him the same standard kosher meal that was available to Jewish inmates and that he said would also comply with his religious requirements, and instead offering him, as the only religiously compliant alternative, one that caused "gastrointestinal problems").

Lind contends, however, that any such analysis overlooks a key factor that, in his view, confirms that the particular denial at issue here did not impose a substantial burden. Specifically, Lind argues that he merely required Fuqua to follow the neutral *procedural* requirement of substantiating his requested accommodation; that such a procedural requirement does not impose a substantial burden; and that any claimed "substantial" burdens that flow from Fuqua's own failure to follow that requirement cannot be considered to have been imposed by Lind. We reject this contention.

The requirements that Lind imposed on Fuqua differ sharply from the sort of modest procedural requirements at issue in *Resnick v. Adams*, 348 F.3d 763 (9th Cir. 2003), on which Lind relies. In *Resnick*, we held that a prison did not violate the Free Exercise Clause by requiring a prisoner, who asked to be provided a kosher diet, to fill out the standard form that the prison used to evaluate such requests before the prison would consider any such request. *Id*. at 769–71. Applying *Turner*'s four-factor test, we held that enforcement

of the standard-form requirement was "reasonably related to legitimate penological interests." *Id*. at 771 (quoting *Turner*, 482 U.S. at 89). In *Resnick*, we held that each of the *Turner* factors favored prison officials, emphasizing that the prison had strong interests in using a standardized form to manage the religious dietary needs of a prison with "1,800 inmates" and that it was "difficult to think of any alternatives more obvious and easy than simply requiring each inmate seeking a religious diet to fill out the standard . . . application form." *Id*. at 769–70 (citation and internal quotation marks omitted). We also noted that Resnick had not shown, and could not show, that his request for a kosher meal would have been denied had he simply "filed the proper application." *Id*. at 769. In a footnote, we likewise held that any burden imposed by the standard-form requirement was not "substantial" for purposes of RLUIPA. *Id*. at 768 n.6. As we explained, "requiring [Resnick] to sign a piece of paper effectively to satisfy standing and exhaustion requirements is by no stretch a 'substantial' burden." *Id*.

Here, the burdens imposed by Lind went well beyond a mere procedural requirement to use a standard form as the vehicle for making a religious dietary request. Rather, they went to the *substance* of the justification that Lind demanded before he would be willing to accommodate Fuqua's request, and they did so in a way that goes far beyond what *Resnick* supports. *Resnick* states that an inmate's adherence to uniform procedural requirements serves important interests by "provid[ing] an opportunity for the chaplain to assess the sincerity of the applicant's belief." 348 F.3d at 769. Although Lind insists that all he did was request the information needed to assess the *sincerity* of Fuqua's beliefs, a reasonable trier of fact could reach a different conclusion on this record.

Fuqua told Lind that he believed that Europeans are the descendants of the 10 northern tribes of Israelites who were conquered by the Assyrians and that, as such, he was required to "observe the Passover Memorial" and to avoid any leavening for the eight days of Passover. In his written justifications for his denial of Fuqua's dietary request, Lind noted his decades-long familiarity with "people who adhere to this belief" about Israelite descent, and he recounted at considerable length—complete with biblical citations—his reasons for concluding that Fuqua's claims about descent from the lost tribes of Israel were simply false and had been debunked by the historical record. Moreover, Fuqua stated—in a declaration that we must take as true for purposes of this appeal—that, during his in-person meeting with Fuqua, Lind "became visibly upset" and "rais[ed] his voice" at Fuqua while telling him that his "beliefs were false"; that Fuqua was "not an Israelite"; that the "Elders of [Fuqua's] doctrines were delusional"; and that his claims "were not supported by historical records." Lind's written explanations also further set forth why he believed that Fuqua's professed need to follow a prescribed diet during Passover did not follow from Fuqua's own religious premises. As Lind explained, the Virginia group whose newsletter Fuqua submitted "do[es] not observe Passover as it was observed in the Old Testament," because its members believe that "Jesus Christ fulfilled the requirements of the Passover sacrifice." The requested meal was therefore inconsistent with the premises of Fuqua's professed religion, because "Fuqua would be anticipating a Passover lamb if he participated in the Passover observance yet he believes that the Passover lamb has already been sacrificed." Lind therefore concluded that the "memorial service" described by the Virginia group, which involved unleavened bread and

grape juice, was "more consistent to [Fuqua's] claimed belief system as well as the belief system of the Virginia Christian Israelites."

Although RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity," the "'truth' of a belief is not open to question." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (quoting *Gillette v. United States*, 401 U.S. 437, 457 (1971)). Rather, the inquiry must remain focused on "whether the [inmate's] beliefs are 'truly held.'" *Id*. (quoting *Gillette*, 401 U.S. at 457). Here, as the district court itself concluded, a rational trier of fact could find that Fuqua's religious beliefs were sincerely held. In addition, on this record, a reasonable factfinder could further conclude that, in carrying out his process with Fuqua, Lind failed to stay narrowly focused on the sincerity of Fuqua's religious beliefs. Instead, a trier could readily find that Lind refused Fuqua's dietary request *because* he thought (1) that Fuqua's fundamental religious premises were false and (2) that, as a theological matter, Fuqua's claimed obligation to observe Passover dietary restrictions did not follow from Fuqua's own religious premises. To be sure, there is also some support for a contrary conclusion in the record. In particular, Lind specifically denied that his detailed written explanations of the falsity of Fuqua's Israelite-descent belief played any causal role in his denial of Fuqua's dietary request. Lind also summarily stated, at the end of his statement in his response to Fuqua's internal appeal, that he thought Fuqua was using the Virginia group's newsletter as a "pretext" to receive the requested dietary accommodation. But on summary judgment, we must believe the nonmoving party's evidence and draw all inferences in that party's favor, and here that is Fuqua.

Accordingly, viewing the record in the light most favorable to Fuqua, we conclude that a reasonable trier of fact could find that Fuqua was denied his requested dietary accommodation, not based on his failure to follow a neutral and valid procedural rule for requesting accommodations, but rather based on Lind's own theological assessment of the correctness and internal doctrinal consistency of Fuqua's belief system. Nothing in *Resnick* endorses such a result, which goes well outside the bounds of a permissible sincerity inquiry. *See Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981) (noting that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect" and that "it is not within the judicial function and judicial competence to inquire whether the [plaintiff] or his [co-religionists] more correctly perceived the commands of their common faith"); *cf.* 42 U.S.C. § 2000cc-5(7) (defining "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"). Denying an accommodation on such grounds, taken together with the practical monetary and physical consequences that Fuqua averred followed from that denial, suffices to establish a substantial burden.

Accordingly, the district court erred in relying on this basis in granting summary judgment to Lind on Fuqua's RLUIPA and First Amendment claims. And because this ground was the only basis for the district court's grant of summary judgment on the First Amendment claim, we

reverse the summary judgment in favor of Lind on that claim.[6]

## B

The district court also erred in granting summary judgment to Lind on Fuqua's Equal Protection claim.

"[T]he Equal Protection Clause entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Shakur*, 514 F.3d at 891 (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)). A claim of religious discrimination in the prison context is generally governed by "the four-part balancing test required by *Turner*," meaning that the claim will fail "if the difference between the defendants' treatment of [the plaintiff] and their treatment of [other] inmates [of other religions] is 'reasonably related to legitimate penological interests.'" *Id.* (citation omitted). Consequently, although "[p]risons need not provide identical facilities or personnel to different faiths," they "must make 'good faith accommodation of the [prisoners'] rights in light of practical considerations.'" *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (citation omitted), *abrogated on other grounds by Shakur*, 514 F.3d at 884–85. "To succeed on an equal protection claim" alleging religious discrimination in the prison context, the inmate "must show that officials intentionally acted in a discriminatory manner." *Id.*

For largely the same reasons that we have already set forth, we conclude that there are triable issues of material

---

[6] By contrast, the district court invoked an additional, alternative ground for granting summary judgment to Lind on the RLUIPA claim. We address that alternative ground in Section III, *infra*.

fact under these standards. As we have explained, a factfinder could reasonably conclude that Lind failed to make a "good faith accommodation" of Fuqua's request for a dietary option that was already being made available to members of another denomination and that Lind intentionally acted *because* of subjective antipathy towards Fuqua's belief system.

Accordingly, we reverse the district court's grant of summary judgment to Lind on Fuqua's Equal Protection claim.[7]

## III

With respect to Fuqua's RLUIPA claim, the district court relied on a second, alternative ground for granting summary judgment to Lind, namely, that RLUIPA only authorizes equitable relief and Fuqua's equitable claims were moot. Fuqua does not dispute that any equitable claim he may have under RLUIPA is moot, but he challenges the district court's holding that a damages remedy is not available against Lind under RLUIPA. We conclude that Fuqua's request for a damages remedy against Lind under that statute is barred under this court's controlling decision in *Wood v. Yordy*, 753 F.3d 899 (9th Cir. 2014). To explain why, we begin by reviewing, in some detail, our decision in *Wood*.

In *Wood*, we addressed whether a damages remedy "against prison officials in their individual capacities" was available under RLUIPA. 753 F.3d at 901. There, the

---

[7] Although Lind raises "the issue of qualified immunity" as an alternative ground for affirmance, "the district court did not reach this issue, and we decline to address it on this appeal." *Hargis v. Foster*, 312 F.3d 404, 411 (9th Cir. 2002) (citation omitted). The district court should consider this issue in the first instance on remand in light of our opinion. *See id.* at 412.

plaintiff, Lance Wood, sued two prison officials, alleging that their restrictions on his use of the prison chapel violated RLUIPA, and Wood sought damages against them. *Id*. at 901–02. As we noted, *id*. at 902, RLUIPA authorizes a private right of action to "obtain appropriate relief against a government" for a violation of the statute, and it defines the term "government" to include "any other person acting under color of State law." 42 U.S.C. §§ 2000cc-2(a), 2000cc-5(4)(A)(iii). The question then, we explained, was whether a damages action against the individual officials was within the scope of the "appropriate" remedies that could validly be awarded under RLUIPA. *Id*. at 902–03.

In analyzing that issue, we began by noting that, in *Sossamon v. Texas*, 563 U.S. 277 (2011), the Supreme Court had considered the question whether RLUIPA's authorization of "appropriate relief" allowed a damages remedy against a State. *See Wood*, 753 F.3d at 902. As *Sossamon* was presented to the Court, the sole basis for applying RLUIPA was that the statute represented an appropriate exercise of Congress's power, under the Spending Clause, to attach conditions to the receipt of federal funds. *See Sossamon*, 563 U.S. at 282 n.1. The Court there held that, in order to show that a State, by accepting relevant federal funds, had waived its sovereign immunity to suits under RLUIPA, there must be an "unequivocal expression of state consent" to that condition in the text of the statute. *Id*. at 284–85. The Court held that RLUIPA's authorization of "appropriate relief," even in full context, was insufficiently clear to provide the requisite "unequivocally expressed intent to waive [States'] sovereign immunity to suits for damages." *Id*. at 288. In *Wood*, we observed that the relevant Spending Clause issue presented in *Sossamon* was different from the one in *Wood*. Rather

than an issue of sovereign immunity, the question in *Wood* was whether allowing a damages action "against individuals who do not receive any federal money would reach beyond the scope of Congress's constitutional authority" under the Spending Clause. 753 F.3d at 902–03.

In addressing that constitutional question, we stated that the Seventh Circuit, in *Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009), *abrogated on other grounds as stated in Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019), had "held that legislation enacted pursuant to the Spending Clause *cannot* subject state officers to individual suits, because the individual officers are not the recipients of any federal funds." *Wood*, 753 F.3d at 903 (emphasis added). This reading of *Nelson* as resting on a *constitutional* holding about the substantive scope of the Spending Clause power is squarely contradicted by *Nelson* itself, which explicitly stated that, "as a matter of statutory interpretation, *and to avoid the constitutional concerns that an alternative reading would entail*, we decline *to read RLUIPA* as allowing damages against defendants in their individual capacities." 570 F.3d at 889 (emphasis added) (footnote omitted). By its plain terms, *Nelson* rested on the doctrine of constitutional avoidance, under which a residual ambiguity in a statute should be resolved in favor of adopting "a construction of the statute" that is "fairly possible" and that will "avoid[]" having to resolve a substantial question as to the statute's constitutionality. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (citation omitted). Although *Wood* may thus have factually misdescribed the holding in *Nelson*, that factual assumption nonetheless informs our understanding of what *Wood* itself then proceeded to hold in a binding precedential opinion.

After discussing *Nelson*, *Wood* stated, without discussion, that the constitutional holding it attributed to *Nelson* was "in accord" with decisions from the "Third and Tenth Circuits." *Wood*, 753 F.3d at 903 (citing *Stewart v. Beach*, 701 F.3d 1322 (10th Cir. 2012); *Sharp v. Johnson*, 669 F.3d 144 (3d Cir. 2012)). Notably, those two cited cases do in fact contain language that explicitly endorses a similar constitutional rule to the one we extracted from *Nelson*. *See Stewart*, 701 F.3d at 1335 ("[T]he Spending Power *cannot* be used to subject individual defendants, such as state employees, to individual liability in a private cause of action." (emphasis added) (quoting *Smith v. Allen*, 502 F.3d 1255, 1274 (11th Cir. 2007)); *Sharp*, 669 F.3d at 154 (same).

*Wood* then proceeded to reject the plaintiff's argument that this reading of Congress's Spending Clause authority was inconsistent with *Sabri v. United States*, 541 U.S. 600 (2004). *See Wood*, 753 F.3d at 903. *Sabri* held that Congress had constitutional power, under the Spending Clause and the Necessary and Proper Clause, to impose *criminal* liability on individuals involved in bribing local officials of a government agency that accepted a specified level of federal funds. 541 U.S. at 603–05. We held that *Sabri* was distinguishable, because Congress's objective in the bribery statute at issue in *Sabri* was "to protect the financial integrity of the governmental entity that did receive the federal funds," whereas "Wood's suit against the defendants in their individual capacities seeks to hold them liable for their personal conduct." *Wood*, 753 F.3d at 903.

*Wood* also rejected the argument that a contrary conclusion was required by *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163 (9th Cir. 2011). *See Wood*, 753 F.3d at 903–04. In *Centro Familiar*, we held that RLUIPA's authorization of "appropriate relief"

included a damages remedy, at least in the context of a suit against a municipal government. 651 F.3d at 1168–69. *Centro Familiar* held that this conclusion was not inconsistent with *Sossamon*, because municipalities lacked Eleventh Amendment immunity. *Id*. at 1169. In *Wood*, we rejected the plaintiff's contention that *Centro Familiar* should be construed as having implicitly rejected any other additional constitutional limitation on the availability of a damages remedy. *Wood*, 753 F.3d at 903–04. We noted that *Centro Familiar* said nothing at all about the Spending Clause and, in any event, the district court opinion in *Centro Familiar* confirmed that the government entity in question received relevant federal funds. *Id*. at 904.

Finally, we stated that nothing in RLUIPA's text "suggest[ed] that Congress contemplated liability of government employees in an individual capacity." *Wood*, 753 F.3d at 904. We instead concluded that the statutory language "does not authorize suits against a person in anything other than an official or governmental capacity, for it is only in that capacity that the funds are received." *Id*. We held that this "is the only reading of the statute that is consistent with the decisions of our sister circuits *and the constitutional limitations on the Spending Clause* that the Supreme Court has recognized." *Id*. (emphasis added). Thus, far from construing the statute to *avoid* deciding a constitutional question, we narrowly construed RLUIPA *because* we concluded that a broader reading would render the provision unconstitutional.

As this detailed analysis confirms, our decision in *Wood* rested squarely, at least in part, on the constitutional holding that the Spending Clause does not allow Congress to impose individual damages liability on state or local officials who are not themselves the recipients of federal funds. Absent

intervening authority from the en banc court or the Supreme Court that is "clearly irreconcilable" with *Wood*'s holding, we remain bound by it. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

Fuqua contends that there is such intervening authority in the Supreme Court's recent decision in *Tanzin v. Tanvir*, 592 U.S. 43 (2020). In *Tanzin*, the Court unanimously held that "appropriate relief," as used in the Religious Freedom Restoration Act ("RFRA"), a statute closely related to RLUIPA, "includes claims for monetary damages against [federal] Government officials in their individual capacities." *Id*. at 45.[8] The Court held that the ordinary meaning of "appropriate relief" included a damages remedy. *Id*. at 49–51. That conclusion was reinforced by the fact that RFRA originally had been drafted to also apply to state and local officials, and it was well established at the time of RFRA's enactment that "damages claims have always been available under § 1983 for clearly established violations of the First Amendment." *Id*. at 50 (citations omitted). *Tanzin* also held that a damages remedy against federal officials in

---

[8] RFRA was enacted in the wake of *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), and it sought to impose legislatively, against both state and federal governments, the strict scrutiny standard that had previously applied to claims alleging a substantial burden on religious exercise under the pre-*Smith* caselaw construing the Free Exercise Clause. *Sossamon*, 563 U.S. at 281. RFRA was subsequently held "unconstitutional as applied *to state and local governments* because it exceeded Congress' power under § 5 of the Fourteenth Amendment." *Id*. (emphasis added) (citing *City of Boerne v. Flores*, 521 U.S. 507 (1997)). However, "Congress responded by enacting RLUIPA pursuant to its Spending Clause and Commerce Clause authority." *Id*. In contrast to RFRA, RLUIPA more narrowly targets only "land-use regulation and restrictions on the religious exercise of institutionalized persons." *Id*. (citations omitted).

their personal capacities presented no constitutional difficulty. *Id*. at 52. In particular, the Court distinguished *Sossamon*, noting that the "obvious difference is that this case features a suit against individuals, who do not enjoy sovereign immunity." *Id*.

While *Tanzin* may suggest that, as a textual matter, "appropriate relief" should be given the same general understanding in RLUIPA as that phrase has in RFRA, *see Apache Stronghold*, 101 F.4th at 1043 (holding that RFRA and RLUIPA "are interpreted uniformly"), *Tanzin* says nothing about the constitutional holding we adopted in *Wood*. *Tanzin*'s constitutional analysis addressed only the issues of sovereign immunity and of Congress's power over *federal* officials. But as applied to the federal Government and its employees, "RFRA is based on the enumerated power that supports the particular agency's work," and not on the Spending Clause. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014). Consequently, *Tanzin*'s constitutional holding sustaining a damages remedy under RFRA against federal officials in their personal capacities says nothing whatsoever about Congress's power under the Spending Clause to impose such liability against individual state and local officials. *Tanzin* thus had no occasion to address the question decided in *Wood* concerning the scope of Congress's Spending Clause authority. *Wood* is thus in no sense irreconcilable with *Tanzin*, much less clearly so. We therefore remain bound by *Wood*, *see Miller v. Gammie*, 335 F.3d at 900, and we must hold that RLUIPA provides Fuqua with no constitutionally valid damages remedy against Lind. Fuqua's RLUIPA claim therefore fails as a matter of law.

## IV

For the foregoing reasons, we reverse the district court's grant of summary judgment to Lind on Fuqua's First Amendment Free Exercise and Fourteenth Amendment Equal Protection claims, and we affirm the district court's grant of summary judgment to Lind on Fuqua's RLUIPA claim.  We remand the case for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**